Mattie WILLIAMS, Plaintiff-Appellee, Cross-Appellant,

v.

PUBLIC FINANCE CORPORATION, Defendant-Appellant, Cross-Appellee.

Ruth A. JACKSON, Plaintiff-Appellee, Cross-Appellant,

v.

USLIFE CREDIT CORPORATION, Defendant-Appellant, Cross-Appellee.

Linda L. SMITH, Plaintiff-Appellee,

v.

PUBLIC FINANCE CORPORATION, Defendant-Appellant.

Leonard and Cora SINGLETARY, Plaintiffs-Appellees,

v.

PUBLIC FINANCE CORPORATION, Defendant-Appellant.

Nos. 77–1337, 77–1706, 77–2112 and 77–3213.

United States Court of Appeals, Fifth Circuit.

July 5, 1979.

Lewis N. Jones, Atlanta, Ga., for defendant-appellant in No. 77–1706.

Charles L. Gregory, Allen I. Hirsch, Atlanta, Ga., for defendants-appellants in Nos. 77–1337, 77–2112 and 77–3213.

Joseph H. King, Jr., Atlanta, Ga., for plaintiffs-appellees in Nos. 77–1337, 77–1706 and 77–2112.

Ralph Goldberg, Atlanta, Ga., for plaintiff-appellee in No. 77–3213.

Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

These four consolidated cases all involve the same question of federal law. The question is whether a loan which is void because it violates a Georgia usury law, the Georgia Industrial Loan Act (ILA), Ga.Code Ann. §§ 25–301, et seq., § 25–9903, can also violate the federal Truth-in-Lending (TIL) Act, 15 U.S.C. §§ 1601, *et seq.* (Consumer Credit Protection Act). All four cases also involve a second, more narrow federal law question. If a loan void under state law can and does violate the TIL Act, is the penalty under the Act the statutory minimum fine of $100, or is the penalty twice the finance charge that was contracted for, but which could not be legally collected because of the ILA violation? Finally, three of the four cases also involve a question of state law—whether a loan at nonusurious rates violates Georgia's usury law because part of the consideration for the loan was a prior usurious loan. To put the

question another way, the issue is whether a loan which refinances a usurious loan at non-usurious rates is also usurious under Georgia's ILA.

■ These cases reach this court with identical histories. In each case the borrower filed a complaint against the lender alleging the lender violated the TIL Act. The lender in each case then counterclaimed for the amount still owed on the loan.[1] And in each case the borrower defended against the counterclaim by alleging that the loan was void because it violated the ILA. The borrowers in all four cases were granted summary judgment on both the TIL Act complaint and the ILA defense to the counterclaim.

## I.

Before reaching the federal law questions of how the TIL Act applies to loans void under state law, we must first determine whether the loans in these cases violated Georgia's ILA.[2] In essence, the state law question is this: does a loan violate the ILA simply because it refinances a loan which itself violated the ILA?

Two of the instant cases, *Williams v. Public Finance Corp.* and *Smith v. Public Finance Corp.,* involve loan contracts which partially refinanced loans which violated the ILA. A third case, *Public Finance Corp. v. Singletary,* involves a loan which refinanced a loan which, in turn, refinanced a loan which violated the ILA. In other words, *Singletary* involves the grandchild of an ILA violator. The fourth case, *Jackson v. U. S. Life Credit Corp.,* involves a loan which itself violates the ILA, so it does not

raise the state law question concerning the inheritance through refinancing of ILA violations.

■ The lenders in *Williams, Smith,* and *Singletary* all concede that the ancestors of the current loans were illegal. Their argument focuses on whether that original sin was inherited. The lenders concede that they cannot recover money lent in violation of the ILA. *Hodges v. Community Loan & Investment Corp.,* 216 S.E.2d 274 (1975). The lenders also concede that a loan which violated the ILA can not be "valid" consideration for a second refinancing loan. *Douglas v. Dixie Finance Corp.,* 139 Ga. App. 251, 228 S.E.2d 144 (1976). However, the lenders argue that they should be allowed to recover the new money they gave the borrowers on the refinancing loans on a theory of unjust enrichment. They argue that the invalidity of the first loan simply means that the second loan fails for lack of consideration, and is not itself illegal. The remedy for a loan which fails for "lack of consideration," the lenders argue, should not be the harsh ILA penalty of full forfeiture, but rather one of the more traditional common law remedies of rescission, restitution, or severance. However, we read Georgia state law as stating that a lender can not recover money lent on the refinancing of a loan which violated the ILA. The controlling case is *Douglas v. Dixie Finance Corp., supra,* which held that a loan contract which violated the ILA and was thus illegal "could not be valid consideration for the execution" of a second, refinancing contract. The *Douglas* court said the second loan was unenforceable and permitted the

---

1. This counterclaim is compulsory, and the district court had jurisdiction over it in each case. *See Mims v. Dixie Finance Corp.,* 426 F.Supp. 627 (N.D.Ga.1976).

2. The ILA regulates only small, short-term loans. (It covers only loans of $3,000 or less repayable in less than thirty-six months and fifteen days.) The ILA establishes for these loans permissible interest rates that are much higher than the rates under Georgia's general usury statute, Ga.Code Ann. § 57–101 (1977). "[T]he quid pro quo for the higher interest rates and loan charges that the Act permits" "is the penalty [the Act] imposes for violations:

the entire loan, both principal and interest, is rendered void." Developments in Georgia Law—Debtor-Creditor Rights, 12 Ga.L.Rev. 814, 892 (1978). [hereinafter Georgia Developments] Thus, "the debtor's obligation to pay the balance of the principal is thereby terminated." *Id.* at 913. *See Hodges v. Community Loan & Investment Corp.,* 234 Ga. 427, 216 S.E.2d 274 (1975). Significantly, this harsh penalty applies whether the ILA violation is willful or inadvertent. *See Moore v. American Fin. Sys.,* 236 Ga. 610, 611, 225 S.E.2d 17, 19 (1976).

borrower to keep the unrepaid portion of the second loan.

■ The instant lenders attempt first to limit, and then to distinguish *Douglas*. We think the attempts fail. First, the lenders argue that *Douglas* did not hold that the refinancing loan itself violated the ILA, but only that it "failed" because part of the consideration was an earlier loan which violated the ILA. However, we do not see this distinction as making any difference on the question of whether the borrower must repay any money under an "unjust enrichment" theory. We note that the *Douglas* court said it was basing its ruling on the case of *Hanley v. Savannah Bank & Trust Co.,* 208 Ga. 585, 68 S.E.2d 581, 582 (1952), which held that a promise based in part on illegal consideration fails entirely. *Hanley* clearly stated that, for reasons of public policy, money paid pursuant to such a contract cannot be recovered. *Hanley* did not distinguish between illegal contracts and contracts based on illegal consideration, perhaps because both would seem to be similarly against public policy. Thus, under Georgia law public policy dictates that a loan based partly on illegal consideration is void and money paid pursuant to the contract need not be repaid. Since this is the same remedy as provided in the ILA for loans which themselves violate the ILA, we need not concern ourselves with the distinction urged by the lenders between illegal loans and loans based in part on illegal

consideration.[3] Whichever way we classify the instant loans, they are void and the borrowers can keep what they still owe.[4]

■ Secondly, the lenders attempt to distinguish *Douglas* by noting that it involved two separate misdeeds—the refinancing of an illegal loan and the failure to rebate unearned interest upon the acceleration of the loan. The lenders argue that only the latter violated the ILA, and that the court permitted the borrower to keep unrepaid loan money solely because of this violation. While it is true that the instant cases do not involve interest rebate violations, we note that Georgia law does not allow a borrower to keep unrepaid loan money where the only ILA violation is the failure to rebate unearned interest. *Liberty Loan Corp. of Shoals v. Childs,* 140 Ga.App. 473, 231 S.E.2d 352 (1976).[5]

■ Thus, since *Douglas* did allow the borrower to keep unpaid loan money and *Childs* did not, it seems logical to assume that the *Douglas* court applied the full forfeiture penalty because of the refinancing violation. Since the same violation exists in the instant cases, we think Georgia law requires us to order forfeiture also.

The essence of the lenders' argument is their claim that the refinancing loan incorporated a usurious loan without itself charging usurious rates. While we can imagine hypotheticals in which this would be the case,[6] we think that none of the instant cases fit this description. In each of

---

3. For a discussion of the special circumstances in *Singletary*, see note 8 *infra*.

4. We note that this result is even more equitable in the instant cases than in the *Hanley* type of case because in our cases the parties "enriched" by our ruling are the innocent victims of the illegal acts of the lenders, while the beneficiaries of the ruling in *Hanley* are more likely to be parties who knowingly contracted for the performance of an illegal act.

5. The *Childs* court based its holding on the fact that the ILA violation did not involve an illegal loan contract or a contract based on illegal consideration, but rather only a legal contract which the lender attempted to implement in an illegal manner. In short, the court distinguished between contracting for usurious interest and simply charging or collecting usurious interest in excess of a legal contract. It held

that, although both are violations of the ILA, the full forfeiture penalty only applies to the former. The instant cases, of course, involve usurious contracts and not simply usurious charges made pursuant to a legal contract.

6. For example, consider a case in which the lender lent new money and refinanced a prior usurious note at such a low rate of interest that the borrower would be paying a legal rate on the new loan even if the prior note were rendered void. (This hypothetical, admittedly far-fetched, is somewhat easier to imagine if one takes a case in which the initial loan is almost completely paid off, and the second loan is made at a time when market pressures are keeping loan rates far below the usury limits in the law.) In this hypothetical one might possibly argue that the ILA would be adequately enforced by rendering only the first loan void,

the instant cases the loan in issue was made at the maximum rates allowable under the law. A loan at maximum rates is effectively usurious if part of the consideration for the debt is invalid. For example, assuming the usury limit is 10%, if a lender makes a $100 loan at 10% which in part refinances an illegal $1 debt, the lender is effectively charging the borrower $10 on a $99 loan. That is usury and a violation of the ILA.[7]

and allowing the lender to recover the new money loaned on the second loan. This position seems even more tenable if the first and second loans were made by different lenders. On the other hand, one might take the position that the second loan inherits the original sin of the first and must also be condemned. The wording and legislative history of the ILA make clear that the Act is to be read liberally and broadly to prevent even the most subtle or indirect methods of assessing usurious rates. There can be no question but that a borrower who contracts to pay off an illegal usurious loan, at whatever rates, is still burdened with a loan which is legally void and unenforceable. In effect, allowing such refinancing would be allowing an ILA-violating lender to "repent" by "curing" an illegal loan with a deceptively attractive second loan. Imagine, for example, that a borrower owes $1 on a usurious note. He then refinances the note in a second loan of $10—$9 new money, $1 excused old loan—at 5% interest, which would be well below the usury rate of, say, 10%. In this situation counting the $1 roll-over part of the loan as worthless would result in a slightly higher effective rate of interest on the left-over $9, but still less than a usurious rate. Nevertheless, it is obvious that the lender was able to gain some advantage in the marketplace by making a borrower think he was gaining the excuse of a $1 debt which was in fact worthless. In other words, while the second loan is not itself usurious in a technical sense, it does allow a lender to gain a market advantage by making use of an illegal, usurious loan. We leave to real cases in the future the question of whether the ILA was intended to assess its possibly harsh penalty of forfeiture for this extremely attenuated, but real, use of usurious loans. The lender in such a case could argue, of course, that the ILA would be fully enforced by simply voiding the $1 portion of the debt and either rescinding the rest of the contract (i. e. requiring the debtor to return the $9 lent on the second loan) or severing the rest of the loan (i. e. requiring the debtor to repay the $9 with 5% interest). Voiding the entire $10 loan, thus making the lender forfeit the entire $10 amount lent, might possibly be considered over-enforcement of the ILA. But the borrower might respond that the ILA could be read as punishing with forfeiture any lender who attempts to benefit, directly or indirectly, from usurious loans contracts. The borrower could also note that many cases hold as usurious and void a large unpaid loan simply because it contains one small technical flaw (such as the disclosure failures in some of the instant cases). Such holdings, while clearly mandated by the ILA, could easily be more harsh, and less correlated to the real injury of the borrower or the effective and necessary deterrence of the lender, than the forfeiture of a second refinancing loan in which the lender had derived enormous market benefit from the excusal of a usurious loan. Finally, the borrower could argue that the potential harshness of the ILA penalty was designed to compensate for the fact that most ILA violations are undetected, unpunished, and thus, potentially undeterred. Moreover, the Georgia legislature could have chosen the forfeiture remedy because it is the easiest to apply; thus, it might be argued that switching to traditional common law remedies of rescission or severance in cases in which the lender benefits "indirectly" from usurious rates would frustrate the legislature's intent to avoid costly, case-by-case litigation of relatively small loans in which lenders reap some sort of benefit from usurious loans.

However, the instant cases do not raise these difficult questions of repentent lenders and the inheritability of original sins. We need not resort to the metaphysics of absolution to decide the instant cases because, as we explain in text, the lenders in these cases effectively charged usurious rates by counting illegal loans as consideration in refinancing loans issued otherwise at the maximum allowable rates.

7. The broad language in the ILA makes it clear that it was intended to outlaw loans made at effectively usurious rates, as in the instant cases. The ILA provides that "no person . . shall charge, contract for or receive, directly or indirectly, on or in connection with any loan, any interest, charges, fees, compensation or consideration which are greater than the rates for same provided herein . . . ." Ga.Code Ann. § 25–303. Aside from the considerable breadth of coverage obvious in this passage generally, we find several specific phrases which indicate it applies to the loans in the instant cases. First, we note the use of the phrase "directly or indirectly." Second we note the use of the phrase "on or in connection with any loan." Finally, we note that the passage speaks of excessive "compensation or consideration," and not just excessive interest or fees. All of these phrases, read together, indicate that the Georgia legislature did not intend to allow lenders to enforce usurious loans by simply rolling them over. It could be argued that any loan which refinances an illegal loan is a contract to collect on the prior loan "indirectly," a contract to collect "in con-

Under Georgia law the remedy for such a violation of the ILA is that the entire loan is rendered void and the borrower can keep whatever he still owes. *Hodges, supra.*[8]

## II.

We next consider the major federal law question in these cases, which is whether the federal Truth-in-Lending Act applies to loans which are void because they violate Georgia's ILA. The lenders in all four of the instant cases argue that the TIL Act does not apply to loans which violate the ILA because the ILA renders such loans "null and void." The lenders argue that since the loans are void *ab initio* under state law, the loans do not comprise consumer credit transactions within the meaning of 15 U.S.C. § 1639(a) of the TIL Act, or "credit . . . extended" within the meaning of § 1631(a). The lenders concede their loans contain misleading disclosures which would constitute violations of the TIL Act if the loans were not rendered void by state law. They argue, however, that state law must be seen as, in a sense, preempting federal law in this context because generally the TIL Act leaves to state law the legal definition of a loan contract. In effect, the lenders are asking us to give special lenient treatment to lenders who violate two laws instead of just one. We decline to do so.

We do not think it appropriate or especially helpful to engage in an extended and rather formalistic debate over the definitions of voidness and nullification. Rather, we think the real question in this case is a relatively standard one of statutory interpretation. More specifically, we think the question is whether Congress intended that the TIL Act would apply to loans which

violated state usury laws punishable by forfeiture. At the outset we note that no exception for such loans is made explicitly in the TIL Act. Moreover, since the Act is to be construed liberally to effect its remedial purposes, *Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 748 (5th Cir. 1973), we are generally disinclined to read into the Act an implicit exception which benefits lenders at the expense of borrowers. However, the real test of whether this exception was intended or not must start with the question of whether it serves or disserves the purposes of the Act.

[12] The TIL Act is designed to compensate borrowers for injuries caused by misleading disclosures and to deter lenders from making misleading disclosures. The Act attempts to achieve these purposes by, among other things,[9] awarding the borrower twice the finance charge in the illegal loan (with the minimum recovery set at $100, and the maximum at $1000), as well as his actual damages, his attorney fees, and his court costs. 15 U.S.C. § 1640(a). As mentioned above, the remedy provided in Georgia's ILA for a usurious loan is the forfeiture by the lender of the unrepaid portion of the loan.

The instant lenders argue that it would be unduly harsh—and in effect, a double penalty—to require a lender to pay damages and a penalty on a loan which the borrower was not obligated to pay back. In terms of the purposes of the TIL Act, the lenders argue that a borrower is adequately compensated for any injuries resulting from a TILA violation and a lender is adequately deterred, by the relatively severe forfeiture provision in Georgia's ILA. Allowing both TILA and ILA recovery, they argue, would

nection with" the prior loan, and a contract for illegal consideration. Furthermore, it is indisputable that the loans in the instant cases, made at maximum rates, were rendered usurious by the fact that part of the consideration given by the lender was worthless.

8. Under our analysis in this section it is clear that the attempt of the lender in *Singletary* to distinguish its case because it involves a second generation loan fails totally. The simple fact is

that the final loan in *Singletary* was made at maximum rates while valuing a *worthless* prior loan, and was thus usurious. Moreover, the public policy considerations which influenced the courts in *Hanley* and *Douglas* apply equally to the situation in *Singletary.*

9. The Act also provides a rescission remedy in loans secured by a borrower's home. 15 U.S.C. § 1635.

result in a windfall for the borrower and an over-deterrence of the lender.

On the contrary, we think the ILA does a very inadequate job of ensuring or replacing TIL Act enforcement. To begin with, in many cases a borrower will not detect an ILA or TIL Act violation in his loan until much of the loan is already repaid, especially since many such violations are extremely technical. As the amount of money owed on a loan shrinks over time with each repayment, the incentive for the borrower to assume the cost of suing to void the note under the ILA diminishes. This is especially true given that the ILA does not provide for the borrower's attorney fees. But the TIL Act does not have this built-in graduated statute of limitations. A TIL Act violation results in a payment of twice the originally-assessed finance charge, plus attorney fees and actual damages, regardless of when the borrower discovers the violation and sues. Moreover, the double finance charge in the TILA correlates somewhat with the size of the fraud attempted—the more money a borrower is deceived into paying for his use of the lender's money, the more he receives for uncovering the fraud. On the other hand, the ILA penalty of forfeiture correlates more with how soon the borrower discovers the fraud, and how much he borrowed—not how much he paid for what he borrowed. Finally, the provision of attorney fees in the TIL Act ensures more rigorous enforcement of the Act, in large part because it encourages attorneys, who are generally more able to recognize technical TIL violations than borrowers, to scrutinize loan contracts for TIL violations. The ILA does not have an attorney fee provision.

██ Enforcement of the TIL Act would be seriously undercut by an interpretation of the Act which recognized an implied exception for usurious loans. Such a reading of the Act would allow lenders who violated both the TIL Act and Georgia's ILA to escape the attorney fee penalty in the TIL Act and to enjoy the benefit of the "eroding penalty" remedial scheme in the ILA. We do not think Congress intended to hamper the full discovery and punishment of TIL Act violations by effectively immunizing those lenders who also happened to violate unrelated state laws. The remedial scheme in the TIL Act is designed to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case.[10] Thus, we believe our interpretation of the TIL Act should turn not only on the equities in a particular case, but also on the need for effective implementation of the general purposes of the Act.

Moreover, we think it significant that § 1640 makes a violator of the Act liable to the borrower for *both* the borrower's actual damages, § 1640(a)(1), *and* twice the finance charge in the loan, § 1640(a)(2)(A)(i). Since the double finance charge penalty in § 1640(a)(2)(A)(i) is explicitly a bonus penalty in the Act, to be assessed in addition to actual damages, we are not persuaded by an argument that the penalty is excessively harsh or an unintended windfall in cases in which a state law remedy for an unrelated state law violation simply reduces the borrower's actual damages.[11]

In a sense, our interpretation in the instant cases of the remedial scheme in the TIL Act follows a *fortiori* from our analysis of the Act in *Sellers v. Wollman*, 510 F.2d 119 (5th Cir. 1975). In *Sellers* we observed that the double finance charge penalty in § 1640(a)(2)(A)(i) may be recovered by a borrower even when the loan contract is rescinded under another section of the TIL

---

10. For example, a borrower is entitled to twice the finance charges in his loan even if this award greatly exceeds the actual injury caused by the false disclosure. Compensation for such actual injury is directly covered in § 1640(a)(1).

11. Of course, one might reasonably argue that the award of the state law remedy might possibly affect the measurement of actual damages

under § 1640(a)(1). While that issue is not in these cases, since none of the instant borrowers were given actual damage awards, we note that the possibility of an actual damages set-off reduces the likelihood that Congress also intended that the finance charge penalty would be dependent on unrelated state law remedies.

Act.[12] We wrote that "although a consumer is not forced to pay a finance charge because he has rescinded, he is not precluded from Sec. 1640 relief." *Id.* at 123.

We further wrote:

To force an election between rescission under Sec. 1635 and recovery under Sec. 1640 undercuts the effectiveness of the act without furthering other policies:

The purpose of making creditors civilly liable is to force disclosure of credit terms. The purpose of according borrowers a right of rescission is broader; not only is it designed to compel disclosure, but it also serves to blunt unscrupulous sales tactics by giving homeowners a means to unburden themselves of security interests exacted by such tactics. *See* 114 Cong.Rec. 1611 (1968) (remarks of Cong. Cahill). If borrowers were forced to choose their "remedies," both objectives might be undermined. To the extent that only civil liability is pursued, the sanction against unscrupulous home sales practices is weakened. To the extent that only rescission is chosen—where available— the penalty attendant upon nondisclosure will be less severe and, consequently, the incentive to disclose diminished. *See* Comment, Private Remedies Under the Truth-in-Lending Act: The Relationship Between Rescission and Civil Liability, 57 Iowa L.Rev. 199, 205–07 (1971). *Eby,* [*v. Reb. Realty, Inc.,* 9th Cir. 1974] 495 F.2d [646] at 652. Id.

While not dispositive, of course, we think it significant that this court has said that a borrower may be awarded the full Section 1640 double finance charge remedy even though his duty to pay that charge was voided by a separate provision of the TIL Act. Admittedly the rescinding of a contract under Section 1635, and its voiding under the ILA, are not identical remedies.[13] Nevertheless, both raise similar arguments by the lender about the technical existence of a contract and, to an extent, the fairness of double, windfall damages.[14] In *Sellers* we rejected those arguments, and for similar reasons we do so again today in the instant cases.

Indeed, in several ways our case follows *a fortiori* from the analysis in *Sellers.* First, the *Sellers* rule permits a borrower to recover damages under two separate provisions of the TIL Act for a single violation of the Act. In the instant cases we are simply penalizing a lender twice for violating two separate laws. Secondly, the court in *Sellers* made clear that Congress did not make the remedies in § 1640 and § 1635 mutually exclusive, even though they would be mutually exclusive remedies in traditional common law contract law. If Congress did not imply that the Section 1640 remedy should defer to a related remedy in the same Act for the same violation, then we think it is *a fortiori* that it did not intend to imply that the Section should give way to a state law remedy for an unrelated state law violation.

Moreover, we note that in two of the instant cases, *Williams* and *Jackson,* adopting the lenders' implied exception approach would mean that we would be treating the instant lenders who violated two laws more leniently than if they had violated only one. This is because the amount of money these

---

**12.** In *Sellers* the other TIL Act remedy involved 15 U.S.C. § 1635, which gives the borrower a right to rescind certain transactions involving security interests in his or her home.

**13.** It is not necessarily true that ILA forfeiture will be a harsher penalty than Section 1635 rescission. For example, a lender who made a $10 profit on a loan which is entirely repaid except for the final $5 installment would obviously prefer the ILA penalty to the TILA Section 1635 penalty. Admittedly, however, the ILA penalty would usually be the harsher of the two in most cases.

**14.** The Georgia Law Review wrote:

It seems entirely appropriate that the Sellers court's rejection of the applicability of these common law concepts remains the controlling law in the Fifth Circuit. While the imposition of a double penalty is indeed harsh, that is no reason for the courts to classify as a contract suit what is clearly an independent wrong arising from nondisclosure.

Georgia Developments, *supra,* at 872.

lenders were forced to forfeit under the ILA was less than the amount they owed for the TIL Act violation. Thus, not only are these lenders asking to be free of double penalties, but they are also asking us effectively to reduce their TIL Act penalty simply because they also happened to violate an unrelated state law.

The unreasonableness of this unusual proposition can best be seen in terms of the following hypothetical, which is a crude variation of the general fact situations in *Williams* and *Jackson*. Consider the case of a borrower who repays all but $1 of a $500 loan which has a finance charge of $100. Suppose also that the loan violates both the ILA and the TIL Act. Under the ILA the lender is penalized only the unrepaid $1 that is forfeited because the loan is void. Under the TIL Act the lender would have to pay twice the finance charge, or $200, plus the borrower's court costs and attorney fees. But under the immunization theory of the lenders' in the instant cases, our hypothetical lender would be excused from this harsh TIL Act penalty simply because the loan also violated a state law. On the other hand, a brother lender who lazily violated only the TIL Act but neglected to violate the ILA too would be out the full $200 plus costs, instead of just the unrepaid $1. In short, the instant lenders urge us to hold that two lending wrongs make a right. We deny these lenders this right.

In conclusion, we reject the request of the lenders to read into the TIL Act an implied exception for loans which violate unrelated state usury laws. Such an exception would clearly benefit lenders at the expense of borrowers and would to some extent reduce the deterrence power of the Act. Without an exception written explicitly by Congress, we see no reason to infer one which so obviously goes against the general purposes of the Act. Moreover, we do not think it especially unfair or unjust to order two punishments for a lender who violates two laws. And more to the point, we think it

would be directly contrary to the purposes and policies of the TIL Act to excuse a violator from federal penalty simply because he is also liable for a state penalty, especially where that state penalty may often be less harsh than the federal penalty.

Thus we hold that the TIL Act does apply to the loans in these cases which also violated Georgia's ILA.[15]

### III.

■ Finally we must decide a narrow question concerning the proper measure of the penalty for the TIL Act violations in these cases. The lenders in these cases, and the lower court in the *Jackson* case, take the position that the penalty for the violation of the TIL Act by a loan void under state law should be the statutory minimum of $100, instead of twice the finance charge in the contract. The lenders and the *Jackson* court base their position on the analysis in the case of *James v. American Finance System of East Point, Inc.* (N.D.Ga.1976), in which the special master recommended: "The minimum penalty should be imposed because there is really no finance charge to double . . . . Holding only the minimum civil penalty to be recoverable when the borrower has no direct or indirect duty of payment is necessary to prevent too great a cumulation of remedies to the [borrower]. It is quite a lot to relieve him of his duty of payment."

For reasons similar to those articulated in the last section of this opinion, we reject this position. Returning to the hypothetical loan we described there, at p. 22 *supra*, we note that the *James* approach would penalize the lender who violated both the TIL Act and the ILA a full $99, or 50 per cent, *less* that it would penalize a lender who violated only the TIL Act. Again, we do not think that Congress, in enacting the TIL Act, intended this windfall for lenders who violated two laws instead of one.

15. See *Pickett v. Creditthrift of America, Inc., No. 2*, 430 F.Supp. 113 (N.D.Ga.1977). See also *Berryhill v. Rich Plan of Pensacola*, 578 F.2d 1092, 1099–1100 (5th Cir. 1978) (holding lender liable under both TIL Act and the Alabama Consumer Finance Law, and assessing penalties under both).

■ Moreover, we again note that the double finance charge penalty in § 1640(a)(2)(A)(i) is a bonus penalty to be assessed *in addition* to the § 1640(a)(1) actual damage award. Again, we think this shows that the finance charge penalty is not to be assessed on the basis of a case-by-case determination of fair compensation to the borrower for his actual injuries, but is instead intended as a firm bonus penalty against any lender who tries to defraud a borrower.[16]

■ This court has already made clear that the double finance charge penalty in § 1640(a)(2)(A)(i) applies automatically to disclosure violations, and is not to be a "discretionary" award based on the court's assessment of the equities in the case. *Thomas v. Myers-Kickson Furniture Co.*, 479 F.2d 740, 746 (5th Cir. 1973).

Thus, we decide that the penalty for violating the TIL Act in these cases is "twice the amount of the finance charge in connection with the transaction,"[17] as explicitly provided in 15 U.S.C. § 1640, regardless of whether or not the ILA voids the loan and the duty to pay the finance charge. Accord, *Thomas v. Creditthrift of America, Inc.* (N.D.Ga.1978). Contra, *Lawrence v. Credithrift of America, Inc.*, Civil Action No. 76–622–A (N.D.Ga. June 28, 1978) (Freeman, J.); *Pinkett v. Creditthrift of America, Inc. # 2*, Civil Action No. 76–664–A (N.D.Ga. Nov. 30, 1977) (Edenfield, J.); *Smith v. U. S. Life Credit Corp.*, Civil Action No. 75–1215–A (N.D.Ga. July 27, 1977) (O'Kelley, J.); *James v. American Finance System of East Point, Inc.*, Civil Action No. 75–1220–A (N.D.Ga.Dec. 29, 1976) (Cohen, S. M.).

IV.

■ At the heart of our opinion today is a view that, while Congress may have intended the TIL Act to defer in general to state law definitions of loan contracts, it did not intend the Act to defer to state law remedies for loan contracts which contain unrelated state law violations. We feel there is more than a technical or semantic difference between the ILA's punishment of a usurious loan with forfeiture, and the state law definition of a loan. In these cases we do not have to decide the extent to which a state could unilaterally build exceptions into the federal TIL Act's definition of "credit extended" or "credit transaction" by manipulating its own state laws defining loan contracts. Instead, we think the instant cases involve only parallel federal and state remedies for unrelated violations of federal and state loan laws by clear instances of the extension and transaction of credit. Dual remedies are certainly not alien to our federalism, especially where, as here, the two sovereigns have compatible goals. The lawmakers of the Congress and the State of Georgia independently determined that it would be in the best interests of their constituencies to punish unrelated lending wrongs in unrelated and seemingly inconsistent ways. Neither the constitution nor any maxim of statutory construction demands that we adopt far-fetched views of either law to coordinate the two more smoothly.

Moreover, we eschew an analysis of these statutory cases limited by the common law doctrines of compensation for breach of contract. These cases involve penal statutes, and we are compelled to enforce their clear and direct commands whether or not they seem to be overcompensating in a contract or tort analysis. There is nothing inherently wrong, excessive, or immoral in a borrower receiving two bounties for catching a lending beast who has wronged him twice—first, by sneaking up on him from behind, and then by biting him too hard. The private attorney general who

---

16. To say that the finance charge penalty can be reduced in the discretion of the court where a lender has suffered enough or where a borrower is relieved enough could lead to such untenable conclusions as the view that a judgment-proof debtor can not have a court penalize a lender under § 1640(a)(2)(A)(i).

17. Of course § 1640(a)(2)(A)(i) also provides that the double finance charge penalty shall not be less than a minimum of $100, or more than a maximum of $1000.

exposes and opposes these credit wolves is not deemed unduly enriched when his valor is richly rewarded and his vendor harshly rebuked. Nor does the state's punishment for the usurious bite interfere with Congress's punishment for the wearing of sheep's clothing.

We have come, or gone, a long way from Shakespeare's ancient caution, "Neither a borrower, nor a lender be." In today's world borrowing and lending are daily facts of life. But that a fact becomes diurnal does not mean it has been cleansed of its dire potential. We still heed the Bard's advice, but in our own modern way—by strict regulation of the strong and careful protection of the weak and unwary. While the well-intended efforts of our many sovereigns may at times sound more like discordant and competing solos than mellifluous duets, we, as judges, must restrain our impulse to stray from the score.

All four of these cases were decided below in favor of the borrowers. The district courts approached the cases in a fashion consistent with our analyses here concerning the forfeiture of a loan refinancing a loan which violated the ILA, and the application of the TIL Act to a loan void under state law. Moreover, two of the cases, *Smith v. Public Finance Corp.* and *Singletary v. Public Finance Corp.*, also calculated the penalties for the TIL Act violation in the manner prescribed in this opinion. Therefore, we affirm the judgments in these cases in their entirety. However, in the other two cases before us, *Williams v. Public Finance Corp.* and *Jackson v. U. S. Life Credit Corp.*, the district court assessed only the minimum civil penalty of $100. As discussed in section III *supra*, this was error. Therefore, we affirm that part of the judgments in *Williams* and in *Jackson* which granted summary judgment for the borrowers on both the TIL Act complaint and the ILA defense to the counterclaim. However, we vacate that part of the judgment limiting the penalty for the TIL Act violation to the statutory minimum. We remand both cases to the district court with instructions to adjust the penalties in a manner consistent with our analysis in part III *supra*.

To summarize, we affirm in their entirety the judgments in *Smith* and in *Singletary*. In *Jackson* and in *Williams* we affirm in part, and vacate and remand in part.

Affirmed in Nos. 77–2112 and 77–3213; affirmed in part and vacated and remanded in part in Nos. 77–1337 and 77–1706.

CHARLES CLARK, Circuit Judge, concurring in part and dissenting in part:

I concur in the result reached by the majority on the Truth-in-Lending Act issues raised in these four cases. I dissent, however, from the majority's disposition of the Public Finance Corporation's counterclaims under Georgia law.

All parties concede that if the notes in these cases violate the Georgia Industrial Loan Act, Ga.Code Ann. §§ 25–301 *et seq.*, the lenders may not recover the outstanding principal under any legal theory. The Georgia Supreme Court has held that when a loan agreement violates the Georgia Industrial Loan Act, the lender may not recover the principal or the interest either directly through an action on the note or indirectly in a suit for money had and received. *Hodges v. Community Loan & Investment Corp.*, 234 Ga. 427, 216 S.E.2d 274 (1975). In *Jackson v. Uslife*, the lender concedes that the note violates the Georgia Act and I therefore concur in the court's judgment in the *Jackson* case. In *Williams, Smith* and *Singletary*, however, the only impropriety asserted to be present in the notes sued on is that part of the principal advanced to the borrowers when each was executed refinanced unpaid principal from prior notes that admittedly did violate the Georgia Act. I disagree with the court's holding that the refinancing of the prior notes renders the new notes sued on in these cases violative of the Georgia Act. Since no illegality under the Georgia Act is present in these new notes, I would allow the lenders, under their theory of money had and received, to recover that portion of the principal of the notes that represents new money advanced to the borrowers.

The critical case in the area is *Douglas v. Dixie Finance Corp.,* 139 Ga.App. 251, 228 S.E.2d 144 (1976), an intermediate Georgia court decision. In *Douglas* a lender sued on a note to recover $2,640 of unpaid principal, of which $1,350 represented refinancing of an amount unpaid on a prior note that violated the Georgia Act. The trial court had held that the earlier voided instrument " 'was superseded by the later contract as to which it constituted an accord and satisfaction.' " *Id.* at 144. The appellate court reversed; its entire discussion of the point was set forth in two paragraphs:

> "Accord and satisfaction is where the parties, by a subsequent agreement, have satisfied the former one, and the latter agreement has been executed. The execution of a new agreement may itself amount to a satisfaction where it is so expressly agreed by the parties; and without such agreement, if the new promise is founded on a new consideration, the taking of it is a satisfaction of the former contract." Code § 20–1201.

> Unless specifically agreed to by the parties, a renewal of a promissory note alone is not an accord and satisfaction. *Blackshear Mfg. Co. v. Harrell,* 191 Ga. 433(2), 12 S.E.2d 328. The record does not show any such agreement in this case. Moreover, the prior illegal contract could not be valid consideration for the execution of the note sued upon. "If the consideration be good in part and void in part, the promise will be sustained or not, according as it is entire or severable, as hereinafter prescribed. If the consideration be illegal in whole or in part, the whole promise fails." Code § 20–305. *Hanley v. Savannah Bank & Trust Co.,* 208 Ga. 585, 68 S.E.2d 581.

*Id.* at 144–45. Nowhere in *Douglas* does the court state that the void consideration rendered the new note illegal under the Georgia Industrial Loan Act. The Act is not even mentioned in the pertinent part of the court's opinion. The *Douglas* court's discussion is limited to a straightforward analysis under Georgia contract law as to the effect of a partially voided consideration. The *Douglas* court's holding—if the consideration be good in part and void in part and the instrument is not severable, the whole promise fails—is taken verbatim from Ga.Code Ann. § 20–305, part of Georgia's codification of the common law of contracts. *See also* Ga.Code Ann. § 20–1201. Similarly, the two judicial authorities cited, *Hanley* and *Blackshear Mfg. Co.,* are Georgia contract law cases which have nothing to do with the Georgia Industrial Loan Act.

Neither *Douglas* nor *Hodges* would foreclose an action for money had and received on the new money advanced in the notes in these cases. *Douglas* did not hold that the void consideration rendered the second note itself violative of the Georgia Act; it merely held that the contract "failed" for lack of consideration under the doctrine that partially illegal consideration voids the entire promise. *Douglas* would not preclude an action for money had and received. Similarly, the unequivocal holding of *Hodges* that no recovery is permissible for any money lent in violation of the Georgia Act would be honored by disallowing recovery on the refinance portion of the principal while allowing return of the new money advanced.

Finally, though I join in the result reached by the court on the Truth-in-Lending Act issues presented in these cases, I cannot join in the language employed by the court or the spirit it appears to express. The court characterizes the lenders involved in these cases as "credit wolves" dressed in "sheeps clothing," and the borrowers as persons of "valor" to be "richly rewarded" for "catching a lending beast." These pejoratives obscure the economic realities and legal issues that ought to govern these cases.

The lenders in these cases have not preserved for appeal the lower court's finding that the notes involved violated the Truth-in-Lending Act, 15 U.S.C. §§ 1601 *et seq.,* (TILA). In analyzing the legal and economic issues at stake in these cases, however, it is helpful to briefly summarize the nature of the TILA violations in three of the cases, *Williams, Smith* and *Singletary.* In each of these three cases the Special

Master made a finding adopted by the district court that the notes violated the TILA because Public Finance's standard form loan agreements failed to disclose that there is a ten-day limitation on the attachment of security interests in after-acquired property. As enacted in Georgia, the UCC in § 9–204(4)(b) provides that no security interest attaches under an after-acquired property clause to consumer goods unless the debtor acquires them within ten days of the loan transaction. Public Finance's loan agreements contain an after-acquired property clause but they do not explain the provision of UCC § 9–204(4)(b). It might be thought that this omission, which is not in any sense a falsehood, would not violate the TILA. The contract's only deficiency is its failure to recite a particular limitation imposed by state law.

In *Pennino v. Morris Kirschman & Co., Inc., 526 F.2d 367, 371 (5th Cir. 1976)*, we held:

> The district court held that the Act does not require a creditor to narrate the law of the forum state, but requires simply a meaningful disclosure of the credit terms he intends to charge. We agree with the district court on this point and find no violation of the Truth-in-Lending Act or Regulation Z. The role of the Federal courts under the Act does not include enforcement of state laws of the type asserted.

526 F.2d at 371.

A panel of this court subsequently held, in *Pollack v. General Finance Corp.,* 535 F.2d 295 (5th Cir. 1976), that the failure to disclose the UCC's ten-day limit on after-acquired property clauses does violate the TILA. The *Pollack* opinion did not cite *Pennino.* The court noted that the *Pollack* disclosure statement was "perhaps not false," but nevertheless found it violative of the TILA. The basic theories of *Pennino,* and *Pollack* are not reconcilable. A lender relying on *Pennino* could not determine that the failure to disclose the UCC's ten-day limitation would be found illegal in *Pollack.* Under the law in this circuit as declared in *Pollack,* Public Finance's loan contracts did violate the TILA. Under *Pennino* I don't see how it could. The violations found are based on judicial precedent that is not internally consistent, and, in any event, are extremely technical. Such a factually arcane and logically dubious "violation" is certainly not the stuff of which credit "wolves" ought to be made.

There is no magic in the small loan business. It operates on the same economic principles that govern any other industry in a free society. Government regulation of consumer loans increases the cost of borrowing money or decreases its availability. As stiff penalties are more and more frequently imposed by courts for even the most technical violations of state and federal law, loan companies inevitably must offset such losses or go out of business. Either the cost of loans must increase or lenders must limit their availability to better credit risks. It is naive to believe that strict enforcement of technicalities will benefit the necessitous borrower. The consumer loan business thrives at maximum rates set by law because the market will bear their high cost. State and federal legislatures have chosen to regulate the consumer loan business, and it is the duty of courts to enforce those regulations ungrudgingly. But the interpretation of state and federal consumer credit laws cannot be distilled into terms so simple as the wolves and the sheep. Courts are not assigned the task of heaping coals on the heads of lenders. Indeed, the facts of life demonstrate that unreasonably severe application of technicalities to lenders only increases the cost of borrowing to those who can least afford it.