Hilda DRYDEN, Appellant,

v.

**LOU BUDKE'S ARROW FINANCE COMPANY, Appellee.**

No. 79–1694.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1980.

Decided Sept. 24, 1980.

Toby H. Hollander, Hollander & Vaughan, St. Louis, Mo., for appellant.

Phillip B. Sachs, Sachs & Miller, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, HENLEY, Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

This is a suit under the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, to recover statutory damages for the defendant's alleged failure to comply with the disclosure provisions of the TILA and Federal Reserve Board Regulation Z, 12 C.F.R. Part 226. The case was tried to the district court, which, without ruling on the alleged violations, held that the TILA does not apply to the "unusual, if not bizarre, set of facts" underlying the case, and that even if the TILA does apply, the defendant is relieved of liability under 15 U.S.C. § 1640(b). *See Dryden v. Lou Budke's Arrow Finance Co.*, No. 79–94C(B) (E.D.Mo., July 12, 1979). We reverse and remand for further findings.

* The Honorable WILLIAM C. HANSON, Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

## I.

The tale of the tangled transaction begins with the purchase by one Nathaniel Foster of a used car—a lemon, as it proved itself to be. Foster bought the car on credit on December 2, 1977, from an auto dealer in St. Louis, Missouri. The circumstances of Foster's purchase are not at issue here. Suffice it to say that financing was provided by defendant—appellee, Lou Budke's Arrow Finance Company (Budke's);[1] a friend of Foster's, Romelia Mitchell, co—signed with him on the retail installment contract, the security agreement, and the note that were executed in connection with the sale; the amount to be paid off in monthly installments was $2,165.04, which sum included a finance charge of $607.32, and $147.22 for credit insurance on the life and health of Romelia Mitchell; the contract, security agreement and note were duly assigned to Budke's, to which the 36 monthly payments were to be made; and on the day of the purchase the auto dealer assigned its certificate of title to the car to Foster, who proceeded to apply for a new certificate in his name, all in accordance with Missouri law. A certificate of title was issued in Foster's name on January 12, 1978, showing the lien in favor of Budke's.

The first payment, in the amount of $60.14, was due on January 1, 1978. Unfortunately, Foster died on December 29, 1977, leaving his estate and Mitchell still obligated to pay for the car. Enter the plaintiff—appellant, Hilda Dryden. Dryden, an elderly home care visiting nurse, who badly needed a car for her personal use, was a friend of Foster's sister, Willie May Gooseby. Gooseby, who was administratrix of Foster's estate, suggested that Dryden "take over" Foster's car. Mitchell and Budke's proved willing to cooperate. The subsequent transaction between Dryden and Budke's is the subject of this lawsuit.

"The evidence," the district court said, "leaves in doubt the precise nature of the transaction." Leaving aside for the moment all question of the understandings or intentions of the parties on this issue, what happened is this. Dryden and Gooseby went by prearrangement to Budke's office on January 25, 1978. At that time the January 1 payment on the car was delinquent; Mitchell was in possession and title remained in Foster's name. Dryden and Gooseby had brought with them the monthly payment coupon book that had been issued to Foster. The agent of Budke's who handled the transaction crossed Foster's name out of the coupon book and wrote in Dryden's. Dryden paid the delinquent January payment and also the payment due on February 1. Gooseby then took Dryden to Mitchell's home to pick up the car. The next day, January 26, Dryden returned to Budke's office. Budke's agent had by then retrieved from their place of storage the retail installment contract, security agreement, and note signed in December by Foster and Mitchell. Dryden read these documents, they were discussed with her by Budke's agent, and it was explained to her that the terms of Foster's original finance transaction would remain in effect as to her, except that an adjustment would be made with respect to the premium for credit insurance on Mitchell, which would be cancelled.[2] Dryden then added her signature to the note. So far it appears that Dryden simply assumed Mitchell's and Foster's existing obligation, and that Budke's accepted her as an obligor under that obligation. See 12 C.F.R. § 226.8(k).

There remained, however, the question of how title to the car was to be put in Dryden's name. As the district court pointed out, it would not have been necessary for

---

1. Budke's is in the general finance business in St. Louis, Missouri, and in the ordinary course of business regularly extends or offers to extend, arranges or offers to arrange for the extension of credit to its customers, for which a finance charge is or may be imposed, and which is payable in more than four installments. See 15 U.S.C. § 1602(f).

2. The facts recounted in this sentence were found by the district court. Dryden has not challenged these findings on appeal, although the facts were disputed at trial. We note that the promised adjustment with respect to the premium for credit insurance on Mitchell was apparently never made.

this purpose to involve Budke's at all: "[Dryden] could have purchased the car directly from Foster's estate with the understanding that as payment therefor she would make the monthly payments due under the Foster–Mitchell contract." Such a course would have been consistent with Dryden's assumption of the Foster–Mitchell obligation. Instead, what the parties did by way of trying to put title in Dryden's name makes their transaction appear to be a hapless attempt at the sale of the car *by Budke's* to Dryden. Thus, while she was in Budke's office on January 26, Dryden apparently signed an application for a certificate of title and left it with Budke's. On the same day, Budke's agent swore out an affidavit of repossession, alleging that Budke's had repossessed the car from Foster and was holding it. Budke's proceeded to apply for a certificate of title in *its* name; one was issued to it on February 21, 1978. The plan, in which Gooseby and Mitchell apparently acquiesced, was that the title would be assigned to Dryden by Budke's once Budke's had title in its name.[3]

"The best–laid schemes o' mice an' men/Gang aft agley,/An' lea'e us nought but grief and pain,/For promised joy!" Quite apart from the irregular title–transferring procedures adopted by the parties,[4] the car, as noted, was a lemon. Dryden testified as follows at the trial:

Q. [By counsel for Dryden] What was the condition of this car when you did get it?

A. [By Dryden] It never did run. It never run. The record is with AAA how many times they towed it. They towed it so many times they were talking about canceling me off.

We went to University City [Romelia Mitchell's] and picked it up. It went to smoking [apparently because of some electrical problem] before we could get into St. Louis, into town with it. I got home with it and the next morning I called AAA.

Dryden had the car towed three separate times, in the approximately three weeks she had it, to the auto dealer that had originally sold it to Foster.

A. [By Dryden] * * * [W]hen I carried it back the last time, the third time it was carried there I told them if you can't fix it I don't want it. * * * But I said if you can fix the car I want the car. * * * I called about three times and they said it wasn't ready. So then I didn't hear no more and weeks rolled on and I called Lou Budke's and they couldn't give me no information. They couldn't give me no information about the car and I never did see the car no more. I never heard no more.

At length Dryden had her son drive her to the auto dealer's place of business. The car was not on the lot. When Dryden saw this, she began calling Budke's on the phone, and on one occasion she went to Budke's office, asking for the return of the $120.28 she had paid on January 25. Budke's consistently refused her request. Budke's evidently deemed Dryden to have abandoned the car and the financing transaction, and, having title in its name already, proceeded to sell the car to one Tommy Fobbs on May 10, 1978.

3. The district court laid responsibility for this plan at Budke's door, saying that Budke's followed it "because of its mistaken belief that the only way to put title in plaintiff's name was for defendant to obtain a 'repossessed' title certificate under Section 301.215 V.A.M.S. and then assign it to plaintiff."

4. As the district court pointed out, Budke's in fact did not repossess the car or have it in its possession on January 26, as it alleged in order to get its repossession title; it did not even have the right to repossess the car on January

26, since the payments were not then in default and in fact were paid ahead; and even if the car had been properly repossessed on that date, it could not have been resold to Dryden at least until the end of April, in view of § 443.300, V.A.M.S., which provides that "[i]f any person . . ., having subjected personal property to a security interest with power of sale, shall die, . . . no sale shall take place of personal property so subjected to a security interest within four months after the death of the person."

Dryden finally went for help in getting her money back to Legal Services of Eastern Missouri. By letter to Budke's dated October 27, 1978, a Legal Service attorney demanded a refund on behalf of Dryden by November 7, or else "we will file our claim in court." The demand letter, perhaps written on the basis of only partial information, fully adopted the "sale" theory of the transaction between Dryden and Budke's:

In January 1978, Ms. Dryden discussed with you the financing of [a car] which your company had repossessed from a previous owner. She paid One hundred twenty dollars and twenty–eight cents to you toward the purchase of this automobile. However, prior to her receiving the title to this car she rescinded her agreement for purchase because of the defective nature of this car.

It is Ms. Dryden's opinion, and ours as her counsel, that she is entitled to a full refund of the money she has paid to you thus far. According to § 301.210 R.S.Mo.:

". . . the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

In that title to the car was not transferred, your company has no claim to Ms. Dryden's funds, and by this letter we demand that she receive this refund.

The demand letter also requested "a copy of any financing agreement between Ms. Dryden and Arrow Finance relevant to this transaction."

Budke's refunded Dryden's $120.28 on November 6, 1978. Legal Services evidently referred Dryden to private counsel for further consideration of any TILA claim she might have. This suit was filed on January 25, 1979. Dryden's complaint alleges, *inter alia*, that she entered into a consumer credit transaction with Budke's on January 26, 1978 that was subject to the TILA; and that in connection with that transaction Budke's violated the disclosure provisions of the TILA and Regulation Z in numerous specified respects. Dryden claims statutory damages in the sum of $1,000, plus court costs and her reasonable attorney's fees. *See* 15 U.S.C. § 1640(a).

## II.

The district court held as follows. After concluding that the January 26, 1978 transaction between Dryden and Budke's cannot have been a valid sale of the car to Dryden, a conclusion with which we do not disagree, the court went on to: (1) hold that even if the transaction be regarded as an attempted assumption by Dryden of the Foster–Mitchell obligation, no credit was extended, and so the TILA disclosure requirements did not apply, because Dryden's addition of her signature to the note was without consideration and therefore legally bound her to nothing;[5] (2) imply that the one–year statute of limitations probably barred Dryden's TILA claim in any case, since she added her name to the Foster–Mitchell note "retroactively to December 2, 1977," whereas this suit was not filed until January 25, 1979; and (3) hold that even if the TILA were otherwise applicable, Budke's would be relieved of liability under 15 U.S.C. § 1640(b) because the parties abandoned the transaction and Dryden got her money back and suffered no actual damages. We disagree with the district court on each of these enumerated matters.

We think it well, to begin with, to settle on a characterization of the January 26 transaction. The district court concluded, and we agree that "[i]t would appear that what was intended, although not spelled out, was for plaintiff to assume the existing obligation of Foster and Ms. Mitchell for the purpose of acquiring ownership of the automobile." Along with the facts already recounted which support this view, the district court specifically found that "defendant did not intend that either Foster or Ms. Mitchell was to be relieved of liability on the note, inasmuch as plaintiff was unable

---

**5.** In so holding, the district court rejected on its own motion a pretrial stipulation entered into by the parties to the effect that "Defendant extended credit to Plaintiff on January 26, 1978."

to get credit on her own." We believe that whatever else the parties may have intended, they intended their January 26, 1978 transaction to be an assumption by Dryden of, and an acceptance by Budke's of Dryden as an obligor under, the Foster–Mitchell obligation to Budke's.

 The issue in this case is whether Budke's extended consumer credit to Dryden within the meaning of the TILA. The district court held that credit was not extended under these facts because the note and attempted resale were unenforceable under Missouri law. The applicability of TILA, however, depends on the words of the statute interpreted in light of the purposes of the act, and not on whether a particular transaction is enforceable under state law. *See Williams v. Public Finance Corp.*, 598 F.2d 349, 355–58 (5th Cir. 1979), *rehearing denied*, 609 F.2d 1179, 1181–85 (1980); *Pinkett v. Credithrift of America, Inc.*, 430 F.Supp. 113, 115 (N.D.Ga.1977). "Credit" under the TILA means the right granted by a creditor to a customer to incur debt and defer its payment. 12 C.F.R. § 226.2(q). In this case, Dryden executed a note payable in installments to Budke's and thus incurred debt and deferred its payment, regardless whether the maker had defenses under state law to the enforceability of the note. Dryden was a customer within the meaning of 12 C.F.R. § 226.2(u) because she is a natural person who incurred debt and deferred its payment, 12 C.F.R. § 226.2(q), for personal purposes, 12 C.F.R. § 226.2(p). Budke's was a creditor within the meaning of 15 U.S.C. § 1602(f). *See Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86, 91–92 (8th Cir. 1976). Thus, as customer and creditor, Dryden and Budke's were subject to the disclosure requirements of the TILA:

> (k) Assumption of an obligation. Any creditor who accepts a subsequent customer as an obligor under an existing obligation shall make the disclosures required by this part to that customer before he becomes so obligated.

12 C.F.R. § 226.8(k); *see also* 12 C.F.R. § 226.807 (detailing the disclosures required to be made under § 226.8(k)).

The purpose of the TILA is to protect customers before the execution of a credit agreement by requiring creditors to disclose the terms of the proposed agreement. 15 U.S.C. § 1601; *Joseph, supra*, 532 F.2d at 90–91. Given this purpose, the ultimate nonenforceability of a credit agreement under state law should not be a defense to an action under the TILA for failure to disclose the information required by the act. We hold that the January 26 transaction was an extension of consumer credit to which the disclosure requirements of the TILA and Regulation Z applied.

 We note also that for the purposes of the limitations period on TILA actions defined by 15 U.S.C. § 1640(e),[6] the relevant date is not December 2, 1977, as the district court implied, but January 26, 1978, the date on which Dryden assumed the Foster–Mitchell obligation:

> (kk) A transaction shall be considered consummated at the time a contractual relationship is created between a creditor and a customer . . . irrespective of the time of performance of either party.

12 C.F.R. § 226.2(kk). A TILA violation occurs, with respect to a closed–end transaction like this one, and the one–year limitations period begins to run, when credit is extended through the consummation of the transaction between the creditor and its customer without the required disclosures being made. *Bartholomew v. Northampton Nat. Bank*, 584 F.2d 1288 (3d Cir. 1978).

We consider, finally, the district court's holding that even if the TILA were applicable to the transaction between Dryden and Budke's, Budke's would be relieved of liability under 15 U.S.C. § 1640(b), which provides that:

> (b) A creditor has no liability under this section for any failure to comply

---

6. 15 U.S.C. § 1640(e) provides: "Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."

with any requirement imposed under this part or Part E of this subchapter if within fifteen days after discovering an error, and prior to the institution of any action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a charge in excess of the amount or percentage rate actually disclosed.

Budke's did not plead or prove, with respect to any of the TILA violations Dryden has alleged, that it complied with the requirements of § 1640(b). The district court's finding of no liability was based rather on other considerations:

> When defendant made the refund of the entire sum plaintiff had paid on January 25, 1978 on Foster's obligation, defendant necessarily insured that plaintiff would not be liable in *any* amount. Inas much as the entire transaction with plaintiff was void ab initio, plaintiff was not required to pay anything and she sustained no damages.

 It is plain, however, that the abandonment of the transaction and the refund of Dryden's money is not a basis for relief from liability under § 1640(b). Nor do we perceive in the circumstances of the case any other basis for relieving Budke's of liability for any TILA violations it may have committed. As to the issue of Dryden's actual damages, it is established that TILA plaintiffs, otherwise entitled to recover, need not show that they sustained actual damages stemming from the TILA violations proved before they may recover the statutory damages the Act also provides for. The statutory damages are explicitly a bonus to the successful TILA plaintiff,[7] designed to encourage private enforcement of the Act, and a penalty against the defendant, designed to deter future violations. *See Williams v. Public Finance Corp., supra; Hinkle v. Rock Springs Nat. Bank*, 538 F.2d 295 (10th Cir. 1976). As to the fact that the transaction was abandoned by both parties and Dryden's money was returned, it is sufficient to note that recovery of statutory damages by a successful TILA plaintiff is not inconsistent with other remedies the plaintiff may have in connection with the same transaction, such as rescission of the loan contract, *see Sellers v. Wollman*, 510 F.2d 119 (5th Cir. 1975), or even forfeiture to the plaintiff, under state usury laws, of the unpaid balance of the loan, *see Williams v. Public Finance Corp., supra*. If Dryden proved that the disclosure provisions of the Act and Regulation Z were violated in connection with the January 26 transaction, Budke's is liable for statutory damages.

The judgment of the district court is reversed, and the case is remanded for findings on the alleged violations of the TILA and Regulation Z and entry of judgment accordingly.

---

7. 15 U.S.C. § 1640(a) (1976) provides in relevant part that:

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or Part D or E of this subchapter with respect to any person is liable to such person in an amount equal to *the sum of—*

(1) Any actual damage sustained by such person as a result of the failure;

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, * * * except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000;

 * * * * * *

(3) in the case of any successful action to enforce the foregoing liability the costs of the action, together with a reasonable attorney's fee as determined by the court. [Emphasis added.]