United States Court of Appeals,

Fifth Circuit.

No. 94-60754.

Juanita B. FAIRLEY, Plaintiff-Appellant,

v.

TURAN-FOLEY IMPORTS, INC., d/b/a Turan-Foley Mitsubishi,
Defendant-Appellee.

Oct. 3, 1995.

Appeal from the United States District Court for the Southern
District of Mississippi.

Before E. GRADY JOLLY and BENAVIDES, Circuit Judges, and
FITZWATER[*], District Judge.

E. GRADY JOLLY, Circuit Judge:

Congress designed the Truth-in-Lending Act ("TILA"), 15
U.S.C. § 1601 et seq., to protect consumers from inaccurate and
unfair credit practices. Juanita Fairley took advantage of the Act
and sued Turan-Foley Imports, Inc. ("Turan-Foley"), alleging
violations of the TILA and state law against misrepresentation
related to Fairley's purchase of a car. Her financing agreement
listed 8.5 percent as the annual percentage rate, when the actual
rate was 11.75 percent annually. When she took possession of the
car, she was also under the impression that she had obtained credit
life and disability insurance, as well as an extended warranty.
After denying Turan-Foley's motion for summary judgment, the
district court, acting on a motion for reconsideration, found that
because no contract existed between the parties, it lacked subject

[*]District Judge for the Northern District of Texas, sitting
by designation.

1

matter jurisdiction over the case, and subsequently dismissed the case. Fairley appealed. Contrary to the district court's action, we believe this is the type of case for which Congress tailored the TILA. For the reasons explained below, we hold that the district court erred when it determined that a contract between the parties did not exist under Mississippi law, and, thus, the district court erred when it dismissed the case for lack of subject matter jurisdiction. Accordingly, we reverse and remand for further consideration.

I

This case comes to us in a rather unusual posture. A thorough discussion of the facts and procedural history therefore will help to explain the result we reach today.

On July 24, 1992, Juanita Fairley went to Turan-Foley to shop for a new automobile. Finding a 1992 Mitsubishi Eclipse sports car that she liked, Fairley completed and signed a credit application form from General Motors Acceptance Corporation ("GMAC") that had been given to her by a Turan-Foley finance and insurance manager, Thomas Matherne. Matherne promised Fairley a competitive interest rate of 8.5 percent. Wishing to check her credit union for a better interest rate, Fairley left the dealership. Matherne, however, called Fairley before she had time to check other rates and convinced her to return to Turan-Foley to see what he could offer her through GMAC.

On July 27, 1992, Fairley returned to Turan-Foley and spoke with Matherne and Jimmy Yelverton, the general manager of the

dealership.  Fairley told them that she wanted her payments to be between $250 and $267 per month for sixty months, and that she wanted credit life and disability insurance, as well as an extended warranty.  She took the Eclipse for a test drive, and signed forms for credit life and disability insurance, an application for a certificate of title, and a sheet stating that Turan-Foley would install air conditioning and provide other services (the "We owe" document).  The record also indicates that Fairley made a downpayment on the car in the amount of $1,000, which was received by the dealership on July 29.  Fairley did not take the car home after the July 27 visit, but instead arranged to pick it up on Friday, July 31.

When Fairley arrived to claim the car on Friday, she spoke with Matherne and reminded him that they still had to complete an agreement regarding financing.  Matherne told her that it was all taken care of and that a copy was in the glove compartment.  When Fairley examined the supposed agreement, she found that it was not satisfactory for several reasons.  First, the piece of paper that was called an agreement by Matherne was actually a partial copy of a finance agreement;  that is, the lower portion of the page was missing.  Second, this lone piece of paper was not what Fairley anticipated as a contract for the sale of the car.  She expected the contract to be in a "pack" of documents.  Third, the space on the agreement where the annual percentage rate and the finance charge were located was completely covered by a white sticker, so that the area was blank.  When Fairley confronted Matherne with

3

these shortcomings and demanded a complete agreement, Matherne first told her that he could not give her the contract because, as it was late on a Friday afternoon, everything was already locked for the evening. When this information did not appease her, he agreed to write in the area reserved for the annual percentage rate and the finance charge that the annual percentage rate was 8.5 percent for 60 months, he noted on the paper that the original contract could be obtained on Monday, August 3, and he signed this notation. Despite Matherne's assurances that everything was okay, Fairley was bothered by the fact that she had not actually signed what she considered to be a contract, the financing agreement.

On Monday, August 3, 1992, Fairley tried repeatedly by phone to contact Matherne, but he could not be reached. She did, however, leave a message that she wanted her contract. After several unsuccessful attempts to reach Matherne that week, Fairley was phoned by a representative of the dealership on Saturday, August 8, about returning to Turan-Foley to sign papers. Fairley could not go to the dealership at that time because she was about to travel out of town for the remainder of the weekend, but she told the representative that she wanted the papers so that she could consult a lawyer about the transaction. During the conversation, the representative said that he did not want to give the papers to her if she planned to visit a lawyer, but that she should still come to the dealership to sign everything.

While Fairley was away for the weekend, representatives of Turan-Foley paid several visits to her family and friends,

4

harassing them and demanding that Fairley sign the papers. On Monday, August 10, after returning from her trip, Fairley consulted a lawyer about the situation. The attorney recommended that she go to the dealership and obtain copies of all the documents in her file so that the attorney could examine them before Fairley signed the documents. When Fairley and a neighbor visited the dealership, Yelverton, the general manager of the dealership, told Fairley that everything was okay because Turan-Foley had her signature on a financing contract with Mitsubishi, dated July 27. Fairley immediately protested that she had never signed a contract with Mitsubishi, and declared the signature a forgery when Yelverton let her look at the contract. Yelverton refused to give Fairley a copy of the signed contract, and he asked her to leave.[1]

In August, the first payment on the car became due. Fairley hand-delivered to Yelverton a check payable to Turan-Foley. Yelverton first accepted the check, but when he noticed that the payee was Turan-Foley, he returned the check to Fairley's attorney. Fairley sent the check and all future payments directly to Mitsubishi Credit Corporation in Casselberry, Florida, and, according to the record, has never missed a payment. Fairley eventually obtained a copy of the financing contract from Mitsubishi, and learned that she was being charged the annual percentage rate of 11.75 percent rather than 8.5 percent, that she

---

[1]The record indicates that the retail installment contract was assigned to Mitsubishi Credit Corporation as early as July 30 because Turan-Foley received payment for the car from Mitsubishi on that date.

had no disability nor credit life insurance coverage, and that she had not received an extended warranty on the car.

Fairley soon filed a complaint in federal district court alleging violations under the Truth-in-Lending Act, and a state claim of fraudulent inducement into the transaction. After some discovery, Turan-Foley filed a motion for summary judgment. The district court denied the motion, finding that genuine issues of material fact existed. Turan-Foley then filed a motion to reconsider the denial of summary judgment or, in the alternative, to dismiss for lack of subject matter jurisdiction. Upon reconsideration, the district court found that, because Fairley never signed a contract, she was not contractually obligated to purchase the vehicle under Mississippi law. *Fairley v. Turan-Foley Imports, Inc.,* 864 F.Supp. 4, 6 (S.D.Miss.1994). Relying on *Jensen v. Ray Kim Ford, Inc.,* 920 F.2d 3 (7th Cir.1990), the district court found that, because there was no contract under state law, the TILA was inapplicable. *Fairley,* 864 F.Supp. at 7. Accordingly, the district court found that there remained no basis for jurisdiction over the state claim of misrepresentation and dismissed the suit. *Id.*

On appeal, Fairley argues that a contract was consummated under Mississippi law. We agree and reverse and remand for trial.

## II

From the district court's memorandum order, it is unclear whether it dismissed the case by reconsidering and granting Turan-Foley's motion for summary judgment, or by granting the defendant's

6

motion to dismiss for lack of subject matter jurisdiction. In any event, we review *de novo* the district court's action. *See Musslewhite v. State Bar of Texas,* 32 F.3d 942, 945 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2248, 132 L.Ed.2d 256 (1995) (*de novo* review of Fed.R.Civ.P. 12(b)(1) motion); *Little v. Liquid Air Corp.,* 37 F.3d 1069 (5th Cir.1994) (en banc) (*de novo* review of Fed.R.Civ.P. 56 motion for summary judgment).

A

(1)

The purpose of the TILA is to protect the consumer from inaccurate and unfair credit practices, and "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). "The TILA reflects a transition in congressional policy from a philosophy of "Let the buyer beware' to one of "Let the seller disclose.' By erecting a barrier between the seller and the prospective purchaser in the form of hard facts, Congress expressly sought "to ... avoid the uninformed use of credit.' " *Mourning v. Family Publications Serv. Inc.,* 411 U.S. 356, 377, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318 (1973). To that end, Congress, through the Act, gave the Federal Reserve Board the "authority normally given to administrative agencies to promulgate regulations designed to "carry out the purposes of the Act.' " *Mourning,* 411 U.S. at 365, 93 S.Ct. at 1659. The language of the Act's enabling provision also emphasized the Board's authority to prevent evasion of the

7

rules.  *Id.* at 371, 93 S.Ct. at 1661.  Congress has, therefore, "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559-60, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980).

Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA.  12 C.F.R. § 226.1(a).  A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep."  12 C.F.R. § 226.17(a)(1). Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed, the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate.  12 C.F.R. §§ 226.18, 226.22.

To promote the Act's purpose of protecting consumers, our court has made clear that creditors must comply strictly with the mandates of the TILA and Regulation Z.

> Only adherence to the strict compliance standard will promote standardization of terms which will permit consumers readily to make meaningful comparisons of available credit alternatives.  Strict compliance does not necessarily mean punctilious compliance if, with minor deviations from the language described in the Act, there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation.

*Smith v. Chapman,* 614 F.2d 968, 971 (5th Cir.1980) (citations omitted).  Consistent with its purpose, the statute is meant to be construed liberally in favor of the consumer. *Cody v. Community Loan Corp.,* 606 F.2d 499, 505 (5th Cir.1979), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2973, 64 L.Ed.2d 846 (1980).  Even so, the

8

"remedial scheme of TILA is designed to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case." *Williams v. Public Finance Corp.,* 598 F.2d 349, 356 (5th Cir.1979).

(2)

We look to Regulation Z to determine whether Fairley's claim is one to which the TILA should apply. "Regulation Z obliges creditors to make the statutorily-mandated disclosures before the transaction is consummated." *Davis v. Werne,* 673 F.2d 866, 869 (5th Cir.1982) (internal quotation and footnote omitted). Consummation is defined under Regulation Z as "the time that a consumer becomes contractually obligated on a credit transaction." *Clark v. Troy and Nichols, Inc.,* 864 F.2d 1261, 1264 (5th Cir.1989); 12 C.F.R. § 226.2(a)(13). State law determines when a contractual obligation is created that binds the consumer to the credit terms. *Clark,* 864 F.2d at 1264; 12 C.F.R. § 226, Supp. 1, Official Staff Interpretations, Section 226.2(a)(13).

B

Because "consummation" is defined by Regulation Z as the point under state law when a "contractual obligation on the consumer's part is created," our focus in this analysis is on Fairley. Thus, "[w]e must examine the transaction through the eyes of the consumer." *Cody,* 606 F.2d at 505. The question of consummation of a contract in Mississippi is determined by statutory and common law. Mississippi has adopted the Uniform

9

Commercial Code, and whether there is an enforceable contract that satisfies the statute of frauds is governed by Miss.Code Ann. § 75-2-201 (1981). Generally, a contract for the sale of goods for $500 or more is not enforceable unless there is some writing. Miss.Code Ann. § 75-2-201(1). "A writing must meet three requirements to satisfy the statute of frauds: 1) the writing must be sufficient to indicate that a contract for sale has been made between the parties, 2) the writing must be signed by the party against whom enforcement is sought, and 3) the writing must specify a quantity." *Migerobe, Inc. v. Certina USA, Inc.,* 924 F.2d 1330, 1333 (5th Cir.1991) (internal quotations and citations omitted). "The statute of frauds can be met through the integration of several documents, each of which alone might not be sufficient to meet these three requirements." *Id.* A contract that does not meet the three requirements but is valid in other respects is enforceable "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise that a contract for sale was made." Miss.Code Ann. § 75-2-201(3)(b). Further, a contract that does not satisfy the statute of frauds is nevertheless enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted." Miss.Code Ann. § 75-2-201(3)(c).

In making the determination that Fairley, the consumer, had become contractually obligated, we find that additional sections of the Mississippi Code are relevant to the facts in this case. Section 75-2-204 states that "a contract for the sale of goods may

10

be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Additionally, section 75-2-607 states that the effect of acceptance of goods is that the buyer must pay at the contract rate for any goods accepted and acceptance precludes rejection of the goods accepted.  Miss.Code Ann. § 75-2-607 (1972).  Finally, "Acceptance of goods occurs when the buyer (a) after reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;  ... or (c) does any act inconsistent with the seller's ownership."  Miss.Code Ann. § 75-2-606.

Whether an enforceable contract exists and whether defenses to the enforceability of that contract exist should not be confused. "Questions of the validity, enforceability, and construction of contracts—whether the parties have satisfied the law's formal requisites—are committed to the court as distinguished from the trier of facts."  *Leach v. Tingle,* 586 So.2d 799, 801 (Miss.1991). While in this case we must determine whether an enforceable contract exists, we pass no judgment on whether any defenses may exist to the contract.

C

(1)

Turning to the case before us, we first examine whether the integration of the writings is sufficient to meet the requirements of the statute of frauds, and thus sufficient to constitute a contract between the parties.  To make this determination, we look

to the various documents of record: Fairley's signed check for $1,000 accepted by Turan-Foley as a downpayment; the extended warranty agreement with Turan-Foley signed by Fairley, requiring her to pay $300 for coverage on a 1992 Eclipse with a specified vehicle number; the application for a certificate of title, describing the buyer, seller, and specific automobile, signed by Fairley and Matherne; the Turan-Foley "We owe" document signed by Fairley and a dealer representative; and the record of Mitsubishi's payment of the balance due on the car, indicating that the financing agreement had been assigned to Mitsubishi Credit Corporation. Finally, Matherne signed the first retail installment contract that Fairley received the day she picked up the car. On this document, Matherne noted that Fairley would receive an 8.5 annual percentage rate, when the figures on the document are, in fact, consistent with financing at an 11.75 annual percentage rate. In sum, because the dealer accepted Fairley's downpayment on the car, and because the integration of the documents, various of which the parties executed jointly or individually, indicate there was agreement on the specific vehicle for sale, the car's retail price, the interest rate and various coverages in the eyes of the consumer,[2] we hold that the parties had entered into an enforceable contract.

(2)

---

[2]*See Cody v. Community Loan Corp.,* 606 F.2d 499, 505 (5th Cir.1979), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2973, 64 L.Ed.2d 846 (1980) ("[W]e must examine the transaction through the eyes of the consumer.").

Furthermore, the parties' actions in this particular case support our conclusion that Fairley had incurred contractual obligations. "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Miss.Code Ann. § 75-2-204 (1972). Such a contract, though not satisfying the requirements of the statute of frauds, is nonetheless enforceable with respect to those goods for which payment has been made and accepted. Miss.Code Ann. § 75-2-201(3)(c). Fairley and Matherne had discussed financing the car at an 8.5 annual percentage rate along with insurance and warranty coverages and had arrived at an oral contract. The car and initial payments on it were delivered and accepted, and Fairley has continued to make monthly payments on her car faithfully. Furthermore, Turan-Foley's quick assignment of the retail installment contract to Mitsubishi Credit Corporation before Fairley even picked up the car is an act inconsistent with the dealership's argument that it did not enter into a contract for the sale of the car. Turan-Foley's argument, that the absence of Fairley's signature on either financing agreement indicates there was no consummation, is fully inconsistent with its conduct indicating the sale of the car at a specified interest rate, and is not well taken.[3] Thus, the conduct of the parties in this

---

[3]Turan-Foley, furthermore, asserted for the first time at oral argument that because Fairley did not sign the contract, no contract exists under Mississippi's Motor Vehicle Sales Finance Act. Miss.Code Ann. §§ 63-19-1 et seq., 63-19-31(1)(a). Because Turan-Foley did not make this argument at the district court, we

particular case, indicating intent and understanding, viewed in combination with the various writings between the parties, fully satisfies us that the jurisdictional requirements of the Act and its implementing regulations have been met.

### III

Because we hold that a contract between the parties for the sale of the car was consummated, the district court erred in finding to the contrary. The district court, moreover, erred when it found that it did not have subject matter jurisdiction to consider the TILA claims, and, therefore, we reverse.[4] *See Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper

---

will not consider it on appeal. *Earvin v. Lynaugh,* 860 F.2d 623, 627-28 (5th Cir.1988), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 861 (1989).

[4]The district court's reliance on *Jensen v. Ray Kim Ford, Inc.,* 920 F.2d 3 (7th Cir.1990), was misplaced. The enforceable contract in the case before us is the contract created by the integration of the several documents discussed in section II, *infra.* Fairley relies on this transaction for creation of her obligation, not on the second, allegedly forged retail sales document. In *Jensen,* the plaintiffs relied upon a second, forged document as a basis for their allegations of TILA violations. Because a forged note under the applicable state law, Illinois, was void, the *Jensen* Court found that the plaintiffs were not obligated under the contract. Thus, because the Jensens were not "obligated" under the second contract, the Seventh Circuit, relying on 15 U.S.C. § 1631, reasoned that the TILA's disclosure requirements were inapplicable. The case at bar can be plainly distinguished from *Jensen,* because Fairley does not rely on the allegedly forged, second retail sales contract as a basis for her claim that Turan-Foley violated the TILA. Instead, she relies on the integration of documents that do not contain a forgery.

14

course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.").  Because we hold that the district court had subject matter jurisdiction to consider the TILA claims, on remand it necessarily can consider the pending state claims.  *See* 28 U.S.C. § 1367.  The TILA is to be enforced strictly against creditors and construed liberally in favor of consumers, and, thus, we REMAND for disposition not inconsistent with this opinion.

REVERSED and REMANDED.