[No. A092156. First Dist., Div. Two. Oct. 5, 2001.]

CORINNE E. BLACK, as Trustee, etc., Plaintiff and Appellant, v. FINANCIAL FREEDOM SENIOR FUNDING CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Corey, Luzaich, Manos & Pliska, Dario de Ghetaldi and George R. Corey for Plaintiff and Appellant.

Fleming & Phillips, James H. Fleming and Edward Romero for Defendants and Respondents Financial Freedom Senior Funding Corporation, Beverly Mirtle, MRCo., Inc., ULLICO, Inc., and Union Labor Life Insurance Company.

Bowles & Verna, Michael P. Verna, Donald A. Velez and Lawrence D. Goldberg for Defendant and Respondent James R. Mahoney.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald Reiter and Michele R. Van Gelderen, Deputy Attorneys General, for the State of California as Amicus Curiae.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

In 1994, Charles T. Black[1] and Corinne E. Black (the Blacks), then 68 and 67 years of age respectively, entered into a reverse mortgage with Freedom Investment Fund, Inc. (Freedom Investment), using their home as the basis for the mortgage. In 1998, the Blacks, as trustees for the Charles T. Black and Corinne E. Black Trust Agreement, brought this action against Freedom Investment and a host of other corporations, companies and individuals, alleging that the manner of their marketing of the reverse mortgage violated various state laws. The defendants moved for summary judgment, arguing that the Blacks' claims were preempted by three federal statutes and their implementing regulations: the Alternative Mortgage Transaction Parity Act of 1982 (the Parity Act) (12 U.S.C. §§ 3801-3806), the Truth in Lending Act (TILA) (Pub.L. No. 90-321, § 101 (May 29, 1968) 82 Stat. 146; see also 15 U.S.C. §§ 1601-1667f) and the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) (Pub.L. No. 96-221, § 1 (Mar. 31, 1980) 94 Stat. 132 (codified as amended in scattered sections of 12 U.S.C. & 15 U.S.C.)). The trial court granted the motion. This appeal followed. We reverse.

## II. BACKGROUND

### A. *Reverse Mortgages*

Reverse mortgages have been described as a financial planning device for the elderly who are often "house rich, but cash poor." (See Hammond, *Reverse Mortgages: A Financial Planning Device for the Elderly* (1993) 1

---

[1]Charles Black died during the pendency of this appeal. We shall, nonetheless, refer to appellants in the plural throughout.

Elder L.J. 75, 76 (hereafter Hammond).) A reverse mortgage can address this dilemma by providing a means for converting home equity into cash. (*Ibid.*) In a reverse mortgage, as in a conventional mortgage, the mortgagee or lender advances money to the borrower or mortgagor. However, in a reverse mortgage the borrower is often times not obligated to repay any portion of the loan or the interest on the loan amount until the property is sold, the loan matures or the borrower dies or experiences an extended absence from the premises. (*Id.* at p. 86; see also 15 U.S.C. § 1602(bb).[2]) The interest on the borrowed sums is added to the principal loan amount and the lender acquires a lien against the house in the amount of the initial principal and accumulated interest. (Hammond, *supra*, 1 Elder L.J. at p. 86.)

## B. *The Blacks' Reverse Mortgage*

On March 28, 1994, the Blacks entered into a reverse mortgage with Freedom Investment, a nonfederally chartered lender, secured by a deed of trust on their home, then valued at $1,060,000. Pursuant to this transaction, the Blacks received $305,455 and Freedom Investment received an interest equal to 70.75 percent of the "maturity value" of the mortgaged property.[3] From the $305,455 that the Blacks borrowed, they paid $11,249.89 as a loan origination fee and $5,583.47 in other fees, taxes and expenses.

The loan amount of $305,455 was calculated as the present value of $749,950 (representing 70.75 percent of the value of the Blacks' home) using a 3.75 percent discount rate over a period of 24.4 years (the Blacks' joint life expectancy). In other words, $305,455 brought forward with 3.75 percent interest for each year of the Blacks' joint life expectancy should equal $749,950.[4]

The amount ultimately due on the loan, however, would most likely exceed $749,950. If the home appreciated in value, Freedom Investment

---

[2]15 United States Code section 1602(bb) provides as follows: "The term 'reverse mortgage transaction' means a nonrecourse transaction in which a mortgage, deed of trust, or equivalent consensual security interest is created against the consumer's principal dwelling— [¶] (1) securing one or more advances; and [¶] (2) with respect to which the payment of any principal, interest, and shared appreciation or equity is due and payable (other than in the case of default) only after— [¶] (A) the transfer of the dwelling; [¶] (B) the consumer ceases to occupy the dwelling as a principal dwelling; or [¶] (C) the death of the consumer."

[3]The reverse mortgage defines the "maturity value" as "the lesser of (i) 93% of the 'Fair Value' of the Property, as defined below in Section 2.5, or (ii) an amount equal to the Property's Initial Value (as defined below) increased at the rate of 13% per annum, compounded annually from the date of this Note to the Maturity Date."

[4]The Blacks contend that this calculation yields an amount slightly greater than 70.75 percent of the then current value of the home.

acquired an interest in a portion of that appreciation, thus increasing the amount ultimately due on the loan and simultaneously increasing the interest rate on the initial borrowed sum.

Moreover, the interest rate was 3.75 percent only if one of the Blacks survived for the length of their joint life expectancy of 24.4 years and continued to reside at their house. However, if they did not, the effective interest rate would exceed 3.75 percent because the Blacks' liability was 70.75 percent of the maturity value of their home regardless of the actual duration of the mortgage (subject to a limited exception).

## C. *The Annuity*

The Blacks used $178,333.33 of the loan proceeds to purchase an annuity from the Union Labor Life Insurance Company (Union Labor Life), the terms of which provided for monthly payments of $1,701.30 for life provided that the Blacks made a second payment on the annuity four years later in the amount of $105,926.48. If the Blacks failed to make the second payment, the monthly annuity benefit was reduced to $719.58. The Blacks apparently did not make this second payment.

## D. *This Litigation*

### 1. *The parties*

The Blacks filed this action against 15 defendants.[5] The Blacks contend, without citation to the record, that they dismissed their complaint as to five defendants and took the defaults of four defendants, including Freedom Investment. The defendants that allegedly remained thereafter, and which are the respondents herein, are ULLICO, Inc., MRCo, Inc., Union Labor Life, Financial Freedom Senior Funding Corporation (Financial Freedom Senior Funding), Beverly Mirtle, and James R. Mahoney. The complaint alleges an intricate relationship between the corporate respondents and Freedom Investment and concludes that the individuality and separateness of these entities ceased and that they should not be permitted to adhere to the fiction of their separate existence. As to the individual respondents, the complaint alleges that Mirtle was a salesperson for Freedom Investment and Mahoney the executive vice-president of Financial Freedom Senior Funding.

---

[5]The Blacks purport to bring this action on behalf of all California residents who have entered into a reverse mortgage with any of the respondents, but the record on appeal includes no indication that the Blacks have yet moved to certify a class.

## 2. *The allegations*

The Blacks' complaint includes causes of action for elder abuse (Welf. & Inst. Code, § 15600 et seq.), unlawful business practices (Bus. & Prof. Code, § 17200),[6] fraudulent concealment and negligent misrepresentation.[7] The complaint generally alleges that respondents used "deceptive advertising [and] misleading transactional documents" and that the reverse mortgage was "written in a manner which was designed to disorient, confuse, and upset the average homeowner . . . ." The complaint identifies the following representations as false and misleading: (1) assurances of uninterrupted monthly annuity income, (2) guarantees of the highest monthly payments and the lowest fees and expenses of any home equity conversion plan being offered, and (3) promises of no prepayment charge and the preservation for the Blacks of 25 percent of the home's future value. The complaint also alleges that Freedom Investment used an unreasonably low projection of home appreciation for its illustrations and inaccurately described the tax characterization of the reverse mortgage transaction.

Another component of the complaint is its allegation that Freedom Investment did not advise the Blacks that they would effectively be prepaying interest inasmuch as Freedom Investment immediately acquired a 70.75

---

[6]Business and Professions Code section 17209 provides that, "[i]f a violation of this chapter is alleged or the application or construction of this chapter is in issue in any proceeding in . . . a state court of appeal . . . the person who commenced that proceeding shall serve notice thereof, including a copy of the person's brief or petition and brief, on the Attorney General, directed to the attention of the Consumer Law Section, and on the district attorney of the county in which the lower court action or proceeding was originally filed. The notice, including the brief or petition and brief, *shall be served within three days after the commencement of the appellate proceeding,* provided that the time may be extended by the . . . presiding justice . . . for good cause shown. *No judgment or relief, temporary or permanent, shall be granted until proof of service of this notice is filed with the court.*" (Italics added.)

The Blacks did not serve the Attorney General or the applicable district attorney within three days after filing their opening brief. (See *Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 285 [67 Cal.Rptr.2d 621].) The Blacks have now served the Attorney General and applicable district attorney, the Attorney General has filed an amicus curiae brief, and respondents have filed an answer to that amicus curiae brief. Accordingly, we find good cause to retroactively extend the time for providing the notice required under Business and Professions Code section 17209. The Blacks' motion for an order extending their time to serve their opening brief on the Attorney General pursuant to Business and Professions Code section 17209 is therefore granted. (Cf. *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 907, fn. 20 [72 Cal.Rptr.2d 73].)

[7]The complaint also included a cause of action based on the Consumer Legal Remedies Act and a cause of action alleging breach of fiduciary duty but, for reasons unrelated to the issues raised in this appeal, the trial court sustained demurrers without leave to amend as to those two causes of action.

percent interest in the home even though the amount disbursed to the Blacks was a much smaller amount.[8]

### 3. *The motion for summary judgment*

Respondents moved for summary judgment solely on the ground that the Parity Act, DIDMCA, TILA and their related regulations preempted the Blacks' causes of action.[9] The Blacks opposed the motion and interjected numerous objections to the evidence on which the motion relied. The trial court granted the motion, concluding that federal law preempted the subject matter of the action.

## III. DISCUSSION

### A. *General Principles of Preemption*

■ The supremacy clause of the United States Constitution (art. VI, cl. 2) grants Congress the power to preempt state law. (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372 [120 S.Ct. 2288, 2293, 147 L.Ed.2d 352].) "Whether federal law preempts state law is fundamentally a question whether Congress has intended such a result. [Citations.] [¶] The 'starting presumption' is that Congress has not so intended. [Citations.] [¶] Preemption of state law by federal law is found in 'three circumstances.' [Citations.] [¶] First, there is so-called 'express preemption': 'Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] [¶] Second, there is so-called 'field preemption': '[S]tate law is

---

[8]While portions of the complaint could be construed as challenging the terms of the reverse mortgage, the Blacks contend on appeal that their "claims are not based on the illegality or amount of defendants' charges" and that, "in its simplest form," "Plaintiffs' complaint . . . alleges that defendants engaged in fraud, elder abuse, and unfair business practices in order to dupe plaintiffs and other elderly California homeowners into entering into reverse mortgage loans they would not have entered into otherwise."

[9]On appeal, respondents also seek affirmance on the ground that there was no factual basis for any of the Blacks' claims. The mere fact that the phrase "there is no triable issue of material fact" appears in the notice of motion is insufficient to indicate that the motion was challenging the factual support for the *merits* of the Blacks' claim. Moreover, respondents' memorandum of points and authorities did not identify the elements of the causes of action much less argue the merits, instead focusing exclusively on the issue of preemption. Because respondents' arguments concerning the merits of the Blacks' claims were not presented to any material extent at all in respondents' motion for summary judgment, we do not consider them in this appeal. (See Cal. Rules of Court, rule 313(b) ["A memorandum of points and authorities shall contain . . . arguments relied on . . . ."].) This conclusion does not foreclose respondents from moving for summary judgment on the merits after this case returns to the trial court.

pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] [¶] Third, there is so-called 'conflict preemption': '[S]tate law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.] Such conflict must be 'of substance and not merely trivial or insubstantial.' [Citation.] It exists when it is 'impossible . . . to comply with both state and federal requirements' [citations] or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' underlying federal law [citations]. Although 'state law is pre-empted to the extent that it actually conflicts with federal law' [citation], it is preempted only to that extent and no further [citation]." (*Peatros v. Bank of America* (2000) 22 Cal.4th 147, 157-158 [91 Cal.Rptr.2d 659, 990 P.2d 539].)

■ "Federal regulations have no less pre-emptive effect than federal statutes." (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].) An agency may preempt state law through regulations that are within the scope of its statutory authority and that are not arbitrary. (*Id.* at pp. 153-154 [102 S.Ct. at pp. 3022-3023].)

■ Regardless of whether the alleged preemption arises by statute or by regulation, courts are reluctant to infer preemption in ambiguous cases. (See *Maryland v. Louisiana* (1981) 451 U.S. 725, 746 [101 S.Ct. 2114, 2128-2129, 68 L.Ed.2d 576]; *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630] (*Elsworth*); Tribe, American Constitutional Law (3d ed. 2000) § 6-28, p. 1175.) It is, therefore, "the burden of the party claiming that Congress intended to preempt state law to prove it" (*Elsworth, supra,* 37 Cal.3d at p. 548). Particularly in an area of law traditionally occupied by the states, such as the exercise of a state's police powers, "Congress's intent to preempt must be 'clear and manifest' to preempt state law . . . . [Citations.]" (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371-1372 [104 Cal.Rptr.2d 197] (*Spielholz*).) Laws concerning consumer protection, including laws prohibiting false advertising and unfair business practices, are included within the states' police power, and are thus subject to this heightened presumption against preemption. (See *California v. ARC America Corp.* (1989) 490 U.S. 93, 101 [109 S.Ct. 1661, 1665, 104 L.Ed.2d 86] [unfair business practices]; *Smiley v. Citibank* (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690] [consumer protection], affd. (1996) 517 U.S. 735 [116 S.Ct. 1730, 135 L.Ed.2d 25]; *Spielholz, supra,* 86 Cal.App.4th at p. 1372.)

## B. *Alleged Preemption Under the Parity Act*

### 1. *The Parity Act*

▮ Respondents contend that three statutes preempt the Blacks' claims. The Parity Act is one of those three statutes.

Congress enacted the Parity Act in 1982 after finding that "increasingly volatile and dynamic changes in interest rates" had "seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed-rate credit secured by interests in real property . . . ." (12 U.S.C. § 3801(a)(1); see also Pub.L. No. 97-320, § 802 (Oct. 15, 1982) 96 Stat. 1545.) Congress concluded that the availability of loans other than traditional fixed-rate, fixed-term transactions was essential to an adequate supply of loans secured by residential property (12 U.S.C. § 3801(a)(2), 3802(1)) and that federally chartered depository institutions had already been given permission to engage in such alternative mortgage financing (12 U.S.C. § 3801(a)(3)).

In light of these findings, Congress enacted the Parity Act "to eliminate the discriminatory impact that . . . regulations [authorizing federal institutions to engage in alternative mortgage financing] have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies." (12 U.S.C. § 3801(b).)[10]

The substance of the Parity Act is found in title 12 United States Code section 3803, which provides in relevant part as follows: "In order to prevent discrimination against State-chartered depository institutions, and other non-federally chartered housing creditors, with respect to making . . . alternative

---

[10]The statute defines alternative mortgage transactions as "a loan or credit sale secured by an interest in residential real property . . . [¶] (A) in which the interest rate or finance charge may be adjusted or renegotiated; [¶] (B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or [¶] (C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation." (12 U.S.C. § 3802(1).) The parties do not dispute that this definition includes reverse mortgage transactions. Their agreement appears reasonable inasmuch as alternative mortgage transactions include debts that can mature over an interval shorter than the amortization schedule and in which the lender shares in the equity and sometimes the appreciation in the mortgaged property. (See 12 U.S.C. § 3802(1)(B) & (C).) The Office of Thrift Supervision has also concluded that the Parity Act covers reverse mortgages. (Off. of Thrift Supervision, interpretative letter (Oct. 20, 1995) p. 6.)

mortgage transactions, housing creditors may make . . . alternative mortgage transactions, except that this section shall apply— [¶] (1) with respect to banks, only to [transactions made in accordance with certain regulations issued by the Comptroller of the Currency]; [¶] (2) with respect to credit unions, only to [transactions made in accordance with other regulations issued by the National Credit Union Administration Board]; [¶] (3) with respect to all other housing creditors . . . only to transactions made in accordance with regulations governing alternative mortgage transactions as issued by the Director of the Office of Thrift Supervision for federally chartered savings and loan associations, to the extent that such regulations are authorized by rulemaking authority granted to the Director of the Office of Thrift Supervision with regard to federally chartered savings and loan associations under laws other than this section." (12 U.S.C. § 3803(a).)[11] On the subject of preemption, the Parity Act provides that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." (12 U.S.C. § 3803(c).)

A note to the statute that created the Parity Act directed "the Comptroller of the Currency, the National Credit Union Administration," and the predecessor to the Office of Thrift Supervision (OTS), the Federal Home Loan Bank Board (see *United States v. Gaubert* (1991) 499 U.S. 315, 317-318, fn. 1 [111 S.Ct. 1267, 1271, 113 L.Ed.2d 335]), to "identify, describe, and publish those portions or provisions of their respective regulations that are inappropriate for (and thus inapplicable to), or that need to be conformed for the use of, the nonfederally chartered housing creditors to which their respective regulations apply . . . ." (Pub.L. No. 97-320, § 807(b) (Oct. 15, 1982) 96 Stat. 1545). The OTS's current response to the note's instruction appears in 12 Code of Federal Regulations part 560.220 (part or section 560.220) and is as follows: "Pursuant to 12 U.S.C. 3803, housing creditors . . . may make alternative mortgage transactions as defined by that section and further defined and described by applicable regulations identified in this section, notwithstanding any state constitution, law, or regulation. In accordance with section 807(b) of Public Law 97-320, 12 U.S.C. 3801 note, §§ 560.33 [concerning late charges], 560.34 [concerning treatment of prepayments and prepayment penalties], 560.35 [concerning loan adjustments],

---

[11]"Housing creditor" is defined within the Parity Act in pertinent part as including "any person who regularly makes loans, credit sales, or advances secured by interests in [residential real property]; or [¶] . . . any transferee of any of them. [¶] A person is not a 'housing creditor' with respect to a specific alternative mortgage transaction if, except for this chapter, in order to enter into that transaction, the person would be required to comply with licensing requirements imposed under State law, unless such person is licensed under applicable State law and such person remains, or becomes, subject to the applicable regulatory requirements and enforcement mechanisms provided by State law." (12 U.S.C. § 3802(2)(C) & (D).)

and 560.210 [concerning disclosures for variable rate transactions] of this part are identified as appropriate and applicable to the exercise of this authority and all regulations not so identified are deemed inappropriate and inapplicable." (§ 560.220 (2000).)[12]

## 2. *The Arguments*

The Blacks construe title 12 United States Code section 3803(c) in conjunction with part 560.220 and argue that the Parity Act only preempts claims concerning the areas identified in part 560.220, namely, late charges, prepayments, prepayment penalties, loan adjustments, and disclosures for variable rate transactions. Respondents argue that part 560.220 does not define the scope of preemption. They instead rely on title 12 United States Code section 3803(c) and the purpose of the Parity Act to argue that nonfederally chartered institutions should enjoy the same preemption of state claims that federally chartered institutions receive under the statute applicable to them—the Home Owners' Loan Act of 1933, 12 United States Code section 1461 et seq. (HOLA). According to respondents, preemption under HOLA is broad enough to preclude the Blacks' claims had they been brought against federal institutions and that the Parity Act extended to state-chartered housing creditors that same protection.

## 3. *Analysis*

We begin by considering whether the Parity Act expressly preempts claims such as the ones presented in this case. The Parity Act permits an alternative mortgage transaction to be made by a housing creditor "in accordance with [12 United States Code section 3803,] notwithstanding any State constitution, law or regulation." (12 U.S.C. § 3803(c); see also 12 C.F.R. § 560.220.) Transactions that are "in accordance with" section 3803 are those that are made "in accordance with regulations governing alternative mortgage transactions as issued by the Director of the [OTS] for federally chartered savings and loan associations . . . ." (12 U.S.C. § 3803(a)(3).) Had that language been included expressly in the preemption provision rather than by inference only, the provision would have read: an alternative mortgage transaction may be made by a housing creditor in accordance with regulations governing alternative mortgage transactions as issued by the Director of the OTS for federally chartered savings and loan associations, notwithstanding any state constitution, law or regulation.

---

[12]The Parity Act provided the states a three-year period during which to opt out of its operation. (See 12 U.S.C. § 3804.) The OTS has concluded that California did not opt out of application of the Parity Act (see OTS, interpretative letter (May 3, 1996) p. 6) and the parties do not argue otherwise.

This language is susceptible to at least two interpretations. On one hand, the phrase "state constitution, law, or regulation" is modified with the adjective "any," supporting the argument that the preemption provision precludes all state regulation of alternative mortgage transactions involving state-chartered housing creditors.

On the other hand, the phrase "any state constitution, law, or regulation" can be interpreted as implicitly limited to those that prohibit or impede alternative mortgage transactions or that *conflict* with federal regulations deemed applicable to nonfederally chartered housing creditors, i.e., the regulations that the transaction must be made "in accordance with." This interpretation would leave broad room for state regulation because there are only four federal regulations with which the transactions of housing creditors must comply. (See § 560.220.)

Other provisions of the Parity Act support the latter interpretation. The Parity Act requires housing creditors to be "licensed under applicable State law" and "subject to the applicable regulatory requirements and enforcement mechanisms provided by State law." (12 U.S.C. § 3802(2).) Here, for example, certain housing creditors in California are required to be licensed under the California Finance Lenders Law (see Fin. Code, §§ 22000, 22100, [requiring license for finance lenders], 22009 [defining finance lenders as including persons engaged in the business of making consumer loans], 22203 [defining consumer loan as including certain loans secured by real property]). That law establishes permissible charges and fees on loans (Fin. Code, § 22306), prohibits false, misleading or deceptive statements (Fin. Code, § 22161), and provides that unconscionable loans violate the statute (Fin. Code, § 22302). When Congress enacted the Parity Act, it was surely aware that such forms of state regulation then existed or, at least, could come into existence in the future because it had no control over the changes and developments that states could subsequently make to their regulatory schemes. Given the breadth accorded the states in regulating "housing creditors" in 12 United States Code section 3802, the preemption language of 12 United States Code section 3803(c) can certainly be interpreted as not extending to state laws that concern aspects of those transactions other than those addressed by the four applicable federal regulations.

However, we need not conclude that this is the only reasonable interpretation of the Parity Act's preemption language in order to reject express preemption in this case. "As is always the case in our pre-emption jurisprudence, where 'federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the "assumption that the historic

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." ' " (*California Div. of Labor Standards Enforcement v. Dillingham Constr. N.A., Inc.* (1997) 519 U.S. 316, 325 [117 S.Ct. 832, 838, 136 L.Ed.2d 791], quoting *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447]; see also *Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [101 S.Ct. 1124, 1130, 67 L.Ed.2d 258] ["Preemption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has *unmistakably so ordained.*' " (Italics added)]; *Elsworth, supra,* 37 Cal.3d at p. 548 ["Courts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it."].) As our analysis has illustrated, the preemption language of the Parity Act does not contain a clear manifestation of congressional intent to preempt all state laws concerning the terms and marketing of alternative mortgage transactions. Absent such clear manifestation, the Parity Act does not expressly preempt claims such as those brought by the Blacks in this action.

The Parity Act and part 560.220 do not impliedly preempt the Blacks' claims either. The regulations deemed applicable to nonfederally chartered housing creditors are so limited in number as to be insufficient to occupy the field (see § 560.220). (Cf. *ITEL Containers Int'l Corp. v. Huddleston* (1993) 507 U.S. 60, 70-71 [113 S.Ct. 1095, 1102, 122 L.Ed.2d 421] [concluding the federal regulatory scheme at issue in that case was not sufficiently pervasive to occupy the field].)

The last form of preemption is conflict preemption. This form of preemption can exist through direct conflict, which respondents do not contend exists here, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, which respondents contend will occur here. (See *Spielholz, supra,* 86 Cal.App.4th at p. 1371.) Whether state law creates such an obstacle turns on Congress's purposes and objectives in enacting the Parity Act.

Congress expressly stated that the purpose of the Parity Act was to "eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors" and to provide nonfederally chartered housing creditors "with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies." (12 U.S.C. § 3801(b).) Respondents argue that this language indicates that the purpose of the Parity Act is

the achievement of absolute parity with federally chartered lending institutions. Thus, if those entities enjoy complete preemption of state regulation of their transactions, so should state-chartered lending institutions.

We are not persuaded by respondents' expansive view of Congress's purpose in enacting the Parity Act. Of course, absolute parity would achieve the results that Congress sought, but so would much less, such as simply authorizing nonfederally chartered housing creditors to engage in alternative mortgage financing. The statute as a whole, in particular the permission retained by the states to regulate housing creditors (see 12 U.S.C. § 3802(2)), counsels against respondents' generous interpretation of congressional purpose, an interpretation that would permit nonfederally chartered housing creditors to present information to borrowers in a misleading, distorted or even inaccurate fashion with impunity because of the lack of *federal* regulation.

For similar reasons, respondents' contention that the goal of the Parity Act is national uniformity in the regulation of state-chartered housing lenders with respect to alternative mortgage transactions is also flawed. Given the dearth of applicable federal regulations, the national uniform standard for state-chartered housing lenders would be "anything goes." That is hardly a uniform standard.

Moreover, different treatment of federally and nonfederally chartered housing creditors is reasonable given that they are very differently situated. "[S]avings associations are subject to a comprehensive regime of regular examination, supervision, and enforcement to determine their compliance with applicable laws and regulations[,]" while "[n]on-depository institution state housing creditors are not." (65 Fed.Reg. 17811, 17816 (Apr. 5, 2000).)

This distinction is significant. For example, in *Spitz v. Goldome Realty Credit Corp.* (1991) 210 Ill.App.3d 215 [155 Ill.Dec 43, 569 N.E.2d 43], affirmed (1992) 151 Ill.2d 71 [175 Ill.Dec 727, 600 N.E.2d 1185], the court considered whether HOLA preempted an Illinois statute upon which the plaintiff relied in suing a subsidiary service corporation of a federal savings association. (569 N.E.2d at p. 45.) In that case "[t]here [was] no question that the doctrine of preemption applie[d] with respect to the parent corporation [citation]; nor [did] the parties dispute that there [was] exclusive federal regulation of federally chartered savings associations and that the Bank Board ha[d] the exclusive and plenary power to 'regulate all the aspects of the operations of Federal associations.' [Citation.] At issue [was] whether the preemption that applie[d] to the parent federal savings associations [was] applicable to the state chartered subsidiary service corporation." (*Id.* at p. 46.)

The court concluded that service corporations did not enjoy the same broad preemption of state law as their federally chartered parent organizations, reasoning as follows: "[N]either Congress nor the Bank Board has attempted to set forth a comprehensive regulatory scheme for service corporations as they did for their federally chartered parent associations. Recognizing the lack of such a comprehensive scheme, it is difficult to conceive that Congress and the Bank Board would only regulate the home mortgage activities of service corporations in selected areas if they did not intend to subject these entities to additional state regulation. An intent to preempt without providing a comprehensive regulatory scheme could lead to the intolerable result of permitting service corporations to perform lending activities, which are traditionally highly regulated, unfettered by *any* regulation." (*Spitz v. Goldome Realty, supra*, 569 N.E.2d at p. 48; see also *Spitz v. Goldome Realty, supra*, 600 N.E.2d at p. 1187 ["Although service corporations are regulated by the Bank Board, they are not regulated to the same extent as federal associations."].) Similarly, here, it would be odd indeed to provide to nonfederally chartered housing creditors, entities that are subject to little federal regulation, the same relief from state regulation that HOLA affords heavily regulated federally chartered institutions.

We reject respondents' interpretation of congressional purpose and conclude that Congress sought to permit nonfederally chartered housing creditors to engage in alternative mortgage financing so long as they complied with applicable federal regulations. Permitting the Blacks to pursue their claims does not stand as an obstacle to that purpose. The Blacks' complaint challenges the adequacy and completeness of disclosures and representations regarding the reverse mortgage. These claims do not seek to prohibit or impede the making of alternative mortgage transactions that comport with the applicable federal regulations; they simply require adequate disclosures. Nor do their claims tread on the areas of federal regulation applicable to nonfederally chartered housing creditors, namely, late charges, prepayments and prepayment penalties, loan adjustments, and disclosures for variable rate transactions. (See § 560.220.) Conflict preemption simply does not apply in this instance.

Our conclusion that the Parity Act does not expressly, impliedly or through conflict preempt the Blacks' claims is consistent with the OTS's interpretation of the preemptive scope of part 560.220. ■ We defer to a federal agency's construction of its own regulations and the statute it is charged to administer. (See *Udall v. Tallman* (1965) 380 U.S. 1, 16-17 [85 S.Ct. 792, 801, 13 L.Ed.2d 616].) ■ Last year, the Director of OTS issued an advance notice of proposed rulemaking in which she explained that "[t]he Parity Act . . . authorizes housing creditors to make alternative

mortgage loans as long as the transactions are 'in accordance with' appropriate and applicable OTS regulations. The Act does not grant housing creditors the same powers as federal savings associations outside of the context of alternative mortgage transactions. Even within that context, state law governs those aspects of a housing creditor's operations not covered by regulations designated as applicable to alternative mortgage transactions under the Parity Act. The limited role the Parity Act plays in the overall regulation of housing creditors has not always been clearly understood."[13] (65 Fed.Reg., *supra,* at pp. 17815-17816.)[14]

Respondents contend that *National Home Equity Mortg. Ass'n v. Face* (4th Cir. 2001) 239 F.3d 633 (*Face*) and *Shinn v. Encore Mortg. Services, Inc.* (D.N.J. 2000) 96 F.Supp.2d 419 (*Shinn*) support their preemption argument.

The *Face* decision does not provide us much assistance because the case concerned the preemption of a state law limiting prepayment fees (see *Face, supra,* 239 F.3d at p. 635), a subject addressed in a federal regulation specifically identified in part 560.220 as applicable to nonfederally chartered housing creditors. That regulation permits prepayment fees so long as they are agreed to in the loan agreement. (See *Face, supra,* 239 F.3d at p. 639.) Thus, conflict preemption was manifest. The state sought to avoid this result by arguing that the Parity Act does not preclude states from regulating areas that are not peculiar to alternative mortgage transactions, that is, that apply to common traditional fixed-rate, fixed-term transactions as well as alternative mortgage transactions. (*Face, supra,* 239 F.3d at p. 636.) The court concluded that the regulation of prepayment penalties was within the regulation of alternative mortgage transactions and that the Parity Act therefore preempted the state law limiting prepayment fees. (*Face, supra,* 239 F.3d at pp. 638, 640.)

The *Face* decision also opines, however, that part 560.220 "is not a provision that defines the scope of federal preemption. Rather, it defines the

---

[13]Respondents urge us not to take judicial notice of this notice of proposed rulemaking. Evidence Code section 451 mandates judicial notice of "[a]ny matter made a subject of judicial notice by . . . Section 1507 of Title 44 of the United States Code." (Evid. Code, § 451, subd. (b).) That federal statute provides that "[t]he contents of the Federal Register shall be judicially noticed . . . ." (44 U.S.C. § 1507.) We therefore reject respondents' argument and grant the Blacks' request to take judicial notice of portions of the Federal Register. In all other respects, we deny the Blacks' motion for judicial notice.

[14]Additionally, in 1997, an interpretative letter issued by the OTS similarly explained that under the Parity Act, "[a]s long as the Company complies with the requirements of . . . OTS regulations [identified in part 560.220] in making and enforcing its [adjustable rate mortgage] loans, the Company need not comply with *conflicting or inconsistent* state restrictions." (OTS, interpretative letter (Feb. 10, 1997) p. 3, italics added.) If OTS interprets the Parity Act as preempting all state restrictions, the use of the adjectives "conflicting" and "inconsistent" would have been unnecessary.

gate through which the non-federally chartered housing creditors must pass in order to obtain the benefits of the Parity Act. If a state lender conforms to the regulations listed in the regulation implementing § 807(b) [§ 560.220], then it will enjoy the preemptive protection that the Act grants in 12 U.S.C. § 3803(c)." (*Face, supra,* 239 F.3d at p. 640.) However, because the state law at issue in that case limited prepayment fees, a subject expressly covered by an applicable federal regulation, the court did not need to consider, as we must, the scope of "the preemptive protection that the Act grants."

Moreover, the framing of the question in the *Face* case demonstrates that that court did not reach a result contrary to the one we adopt here. The Fourth Circuit Court of Appeals explained: "The particular issue presented in this case is whether a non-federally chartered institution in Virginia may require and enforce a prepayment fee in a mortgage agreement notwithstanding Virginia's limitation on prepayment penalties as contained in Virginia Code §§ 6.1-330.83 and 6.1-330.85. The resolution of this issue depends on whether the OTS has issued regulations authorizing prepayment fees as part of its regulations for alternative mortgage transactions, because if it has authorized the collection of prepayment fees in alternative mortgage transactions, then Virginia may not apply its law proscribing such prepayment fees if the non-federally chartered housing creditor has otherwise complied with the requirements of the Parity Act." (*Face, supra,* 239 F.3d at p. 638.) Thus, the Fourth Circuit found it necessary to consider whether the Virginia statute conflicted with a federal regulation pertaining to alternative mortgage transactions. Here, we have no such conflict.

*Shinn* is similarly uninstructive because it also considers whether the Parity Act preempts a state law prohibiting prepayment fees. (*Shinn, supra,* 96 F.Supp.2d at p. 422.) The plaintiffs in *Shinn* argued that the Parity Act only preempts state laws that completely prohibit or obstruct the creation of alternative mortgage transactions. (*Shinn, supra,* 96 F.Supp.2d at p. 425.) The court concluded that the language of the statute did not "support plaintiffs' narrow interpretation of the statute's preemptive effect" and concluded that New Jersey's prepayment law was preempted by the Parity Act. (*Shinn, supra,* 96 F.Supp.2d at pp. 425-426.)[15]

Here, the Blacks' claims relate to matters that are *not addressed* by the federal regulations that part 560.220 identifies as applying to nonfederally chartered housing creditors. Thus, *Face* and *Shinn,* cases considering preemption in that context, are inapposite and, for the reasons given above, we conclude that the Parity Act does not preempt the Blacks' claims.

---

[15]Respondents also cite *First Gibraltar Bank, FSB v. Morales* (5th Cir. 1994) 19 F.3d 1032, but that decision has been vacated (see *First Gibraltar Bank, FSB v. Morales* (5th Cir. 1995) 42 F.3d 895).

## C. *Alleged Preemption under TILA*

Respondents also contend that the Blacks' claims are. preempted by TILA. We disagree.

Clearly, there is no express preemption. Rather than limiting the applicability of state law, TILA emphasizes the continued role of state law, stating that it does "not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency." (15 U.S.C. § 1610(a)(1); see also 15 U.S.C. § 1610(b) ["except to the extent that those State laws are inconsistent with any provisions of section 1639 of this title, and then only to the extent of the inconsistency."].) A federal regulation implementing TILA explains, in relevant part, that "[a] State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law . . . [and] [a] State law is contradictory if it requires the use of the same term to represent a different amount or a different meaning than the Federal law, or it if requires the use of a term different from that required in the Federal law to describe the same item." (12 C.F.R. § 226.28(a)(1) (2001).)

Respondents argue that a state law like Business and Professions Code section 17200 would impose subjective standards of "unfairness," thus contradicting the requirements of federal law. Even if the disclosures provided to the Blacks met all of the requirements of TILA and its implementing regulations, which are known as Regulation Z (see 12 C.F.R. § 226 (2001)), an inconsistency or contradiction with federal law does not exist merely because the state requires disclosures in *addition* to those required by and under TILA. (Cf. 12 C.F.R. § 226.28(a)(1); see also 12 C.F.R. § 226, Supp. I—Off. Staff Interpretation § 226.28(a)(3), p. 434 ["Generally, State law requirements that call for the disclosure of items of information not covered by the Federal law, or that require more detailed disclosures, do not contradict the Federal requirements."].) Respondents' vague assertions of a contradiction between state and federal law are insufficient to satisfy their burden of proving Congress's intent that TILA preempt claims such as those brought. by the Blacks. (See *Elsworth, supra,* 37 Cal.3d at p. 548.)

Respondents also rely on 12 Code of Federal Regulations part 226.28(a)(2)(i) (2001), which provides: "State law requirements are inconsistent with the requirements contained in sections 161 (Correction of billing errors) or 162 (Regulation of credit reports) of the Act [(15 U.S.C.A. §§ 1666 or 1666a)]

and the implementing provisions of this regulation and are preempted if they provide rights, responsibilities, or procedures for consumers or creditors that are different from those required by the Federal law." Respondents latch onto the word "different" and argue that state laws that are merely "different" from federal laws are preempted by TILA. But by its express terms, 12 Code of Federal Regulations part 226.28(a)(2)(i) concerns correction of billing errors and regulation of credit reports, two aspects of lending that are not at issue here. Respondents have not established that TILA or its regulations expressly preempt the Blacks' claims.

Implied preemption has no application here either. TILA preempts only "inconsistent" state laws, thus implicitly negating occupation of the field. (See *Mason v. General Finance Corp. of Virginia* (4th Cir. 1976) 542 F.2d 1226, 1230.)

Nor does conflict preemption apply in this instance. As we have explained, respondents have not identified any direct conflict. Moreover, the purpose of TILA, relevant to this action, is the assurance of "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." (15 U.S.C. § 1601(a).) Stated more generally, TILA is designed to protect consumers from inaccurate and unfair credit practices. (See *Fairley v. Turan-Foley Imports, Inc.* (5th Cir. 1995) 65 F.3d 475, 477.) The Blacks' claims advance this purpose, rather than thwart it.

Our conclusion is consistent with decisions reached by federal courts. In *Williams v. First Government Mortg. & Investors* (D.C. Cir. 1999) 176 F.3d 497, a borrower brought suit under the District of Columbia Consumer Protection Procedures Act (CPPA), alleging that the lender knowingly took advantage of his inability to protect his interests in the loan transaction and knowingly made him a loan he could not repay with any reasonable probability. (*Williams, supra,* 176 F.3d at p. 498.) The United States Court of Appeals for the District of Columbia rejected the argument that TILA preempted the borrower's CPPA claims. (*Williams, supra,* 176 F.3d at pp. 499-500.) The court explained that TILA and CPPA "have quite different purposes and impose quite different requirements. TILA mandates the disclosure of certain documents in lending transactions. [Citation.] The CPPA provides substantive protections for borrowers against unconscionable loan terms and provisions. [Citation.] Nothing in TILA or its legislative history suggests that Congress intended the Act's disclosure regime to provide the maximum protection to which borrowers are entitled nationwide; states

remain free to impose greater protections for borrowers. . . . We thus hold that TILA does not preempt the CPPA and that TILA compliance does not immunize lenders . . . against CPPA liability. [Citations.]" (*Id.* at p. 500.)

The United States District Court for the Northern District of Illinois reached a similar result in *Heastie v. Community Bank of Greater Peoria* (N.D.Ill. 1988) 690 F.Supp. 716 (*Heastie*). In that case, an elderly woman sued a mortgage company and mortgage lender under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), alleging predatory lending practices, such as the use of misrepresentations in order to exact "oppressive" finance charges in the refinancing of her home loan. (See *Heastie, supra,* 690 F.Supp. at p. 717.) Defendants argued that TILA preempted the Consumer Fraud Act claim. (*Heastie, supra,* 690 F.Supp. at p. 720.) The court rejected this argument, reasoning in part as follows: "Obviously, compliance with both the TILA and the Consumer Fraud Act is not a physical impossibility—compliance with the TILA does not imply a violation of the Consumer Fraud Act. It also seems that the Consumer Fraud Act promotes rather than hinders the goals of the TILA. The Consumer Fraud Act prohibits, *inter alia,* 'deceptive practices [employed] in the conduct of any trade or commerce . . .' [citation], thereby promoting the TILA's goal of 'the informed use of credit,' [citation], in a range of conduct larger than that covered by the disclosure provisions in the TILA." (*Heastie, supra,* 690 F.Supp. at p. 721.)

Consistent with these decisions and our own understanding of TILA and its implementing regulations, we conclude that TILA does not preempt the Blacks' claims.

### D.  *Alleged Preemption Under DIDMCA*

Lastly, respondents contend that to the extent the Blacks claim that the loan origination fees, interest charges and the large cash advance fee were unfair and unconscionable, their claims are preempted. Respondents' motion for summary judgment similarly focused solely on the preemptive effect of DIDMCA on these limited aspects of the Blacks' claims. However, the Blacks concede that they do not challenge the fees or interest rates themselves. Given that respondents do not contend that DIDMCA preempts any other aspect of the Blacks' claims, we find no DIDMCA preemption on this record.

## IV. DISPOSITION

We reverse the entry of summary judgment in favor of respondents. Costs on appeal are awarded to the Blacks.

Kline, P. J., and Lambden, J., concurred.

Respondents' petition for review by the Supreme Court was denied January 23, 2002.